**In re Raymond J. DONOVAN.**

**Division No. 85–1.**

United States Court of Appeals, District of Columbia Circuit.

June 9, 1989.

As Amended July 20, 1989.

---

## ORDER

Before MacKINNON, Presiding, BUTZNER and PELL, Senior Circuit Judges.

PER CURIAM.

Upon consideration of Raymond J. Donovan's Application for Attorneys' fees and expenses and Supplemental Application for Attorneys' fees and expenses filed pursuant to Independent Counsel Reauthorization Act of 1987, P.L. 100–191, 101 Stat. 1293 *codified at* 28 U.S.C. 591 *et seq.,* it is hereby

ORDERED, by the Court, that Donovan be awarded $72,875.06 in reasonable attorneys' fees and expenses for the reasons stated in the following opinion.

PER CURIAM.

Raymond J. Donovan, former Secretary of Labor, was the subject of an independent counsel investigation conducted by Leon Silverman. The Independent Counsel's investigation revealed insufficient credible evidence to warrant prosecution and a grand jury returned a no true bill. Donovan now presents this court with an application for reimbursement of attorneys' fees and expenses as provided for by the Independent Counsel Reauthorization Act of 1987.[1]

## I. BACKGROUND OF THE ETHICS IN GOVERNMENT ACT

In 1978, Congress passed the original Ethics in Government Act.[2] The Act provided, upon request by the Attorney General, for a Special Division of the Court of Appeals[3] to appoint a special prosecutor (now independent counsel) for the purpose of avoiding the inherent appearance, if not actuality, of a conflict of interest produced by the Department of Justice investigating possible criminal violations allegedly committed by high officials in the Executive branch. The Act provided a mechanism for ensuring the appearance and actuality of an independent, impartial investigation and prosecution, if warranted, of allegations of high level misconduct in the Executive branch. The Act included a sunset provision, with a five year span.

The first investigation by a special prosecutor demonstrated some defects in the initial legislation. Specifically, Congress and others were troubled by 1) the procedure which led up to the Attorney General requesting the appointment of a special prosecutor and 2) the absence of reimbursement for attorneys' fees incurred by unindicted subjects of special prosecutor investigations. The Special Prosecutor's investigation of Hamilton Jordan provided an example of an allegation which would not have ordinarily been subject to federal

investigation yet Jordan incurred attorneys' fees in excess of $100,000. *In re Jordan*, 745 F.2d 1574, 1576 (D.C.Cir.1984) (The allegation against Jordan was that he had used small amounts of cocaine.).

The *Jordan* case provided some impetus to the movement to amend the Ethics in Government Act. The *Hearings before the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs*, S.Rep. No. 496, 97th Cong., 1st Sess., (July 14, 1982), U.S.Code Cong. & Admin.News 1982, p. 3537, addressed the issues of whether the Act should be extended beyond 1983 and what improvements should be made to the Act. As a result of these Hearings, Congress amended the Act by raising the standard for initiating the Justice Department's preliminary investigation of an allegation of criminal misconduct and referral to the Special Division for the appointment of an independent counsel through incorporating ordinary Department of Justice prosecutorial discretion in determining whether to pursue an allegation. Congress also provided for the reimbursement of "reasonable" attorneys' fees for the subject of an Independent Counsel investigation where the subject is not indicted and the fees "would not have been incurred but for the requirements of the [Act]."[4]

The 1983 amendments that raised the standards which triggered a preliminary investigation by the Department of Justice and referral to the Special Division for appointment of an independent counsel were designed to "establish[ ] a standard administration of justice for officials and non-officials;" thereby avoiding the "unfairness ... [of] imposing a stricter application of the criminal law on public officials." S.Rep. No. 496, 97 Cong., 1st Sess. 15 (1982), U.S.Code Cong. & Admin.News 1982, p. 3551.

Before conducting a preliminary investigation, § 592(a)(1) required the Attorney

---

1. 28 U.S.C. Chapter 40, 101 Stat. 1293, *et seq.*

2. Ethics in Government Act of 1978, Pub.L. No. 95–521, 92 Stat. 1824 (1978).

3. 28 U.S.C. § 49.

4. 28 U.S.C. § 593(g), January 3, 1983, 96 Stat. 2041; under the present statute, attorneys' fees are awarded pursuant to § 593(f).

General to determine whether the allegation of criminal conduct was "specific" and "credible." The 1978 Act [§ 592(a)] had required the Department of Justice to conduct a preliminary investigation merely on receipt of specific information of criminal conduct by a covered official—thus prohibiting the Attorney General from taking into account the credibility of the source of the allegation when determining whether to undertake a preliminary investigation. Moreover, under the revised standard, the Senate Report directed the Attorney General to "follow the usual practices of the Department of Justice in determining the reliability of a source." S.Rep. 97–496 at 12, U.S.Code Cong. & Admin.News 1982, p. 3548.

Pursuant to the 1983 amendments, after completing a preliminary investigation, the Attorney General was required to request the appointment of an independent counsel only where "reasonable grounds to believe that further investigation or prosecution is warranted" exist. § 592(c)(1). Section 592(c)(1) also compelled the Attorney General, when determining if such grounds exist, to "comply with the written or other established policies of the Department of Justice with respect to criminal investigations."

Prior to the 1983 amendments, the 1978 Act obliged the Attorney General to seek the appointment of a special prosecutor unless the allegation was "so unsubstantiated that no further investigation is warranted."[5] § 592(b)(1). In 1982, Congress found this standard to be "far lower than the standard employed at this stage of investigation by other prosecutors across the country in both the federal and state court systems." S.Rep. 97–496 at 14 (1982), U.S.Code Cong. & Admin.News

1982, p. 3550. Congress, therefore, empowered the Attorney General, when determining whether to seek the appointment of an independent counsel, to exercise the "reasonable discretion [that] is regularly practiced by the Department of Justice, U.S. Attorneys, and prosecutors throughout the federal system." *Id.* Congress intended the amended standard for appointing an independent counsel to remedy the problem of "an uneven application of justice [which was caused] by triggering the appointment of a special prosecutor to investigate allegations which are not ordinarily prosecuted by the Department of Justice." *Id.*

Congress' decision to provide for the subject of an independent counsel investigation to be reimbursed for attorneys' fees incurred, in select situations, during the investigation also reflects an intent to protect the subject from an unequal application of justice. Section 593(f)(1) provides, in part:

> Upon the request of an individual who is the subject of an investigation conducted by an independent counsel pursuant to this chapter, the division of the court may, if no indictment is brought against such individual pursuant to that investigation, award reimbursement for those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of this chapter.

28 U.S.C. § 593(f)(1).[6] Inquiries into the awarding of attorneys' fees under the Act have focused on two elements: 1) whether the fees would have been incurred "but for" the Act and (2) whether such fees are "reasonable." The legislative history indicates that the court "should only award that portion of the [reasonable] fees, if any,

---

**5.** The Senate Report on the Ethics in Government Act stated that a refusal to appoint a special prosecutor should be limited to those cases where the preliminary investigation revealed that the allegation of criminal misconduct was "frivolous." S.Rep. No. 521, 95th Cong., 2d Sess., 55 (1978).

**6.** Subsection 593(f)(1) also provides that "[t]he division shall notify the Attorney General of any request for attorneys' fees under the subsec-

tion." The following subsection, 593(f)(2), empowers the court to "direct" the Department of Justice to evaluate any application for fees under the Act examining:

(A) the sufficiency of documentation
(B) the need or justification for the underlying item; and
(C) the reasonableness of the amount of money requested.

§ 593(f)(2).

which it determines would not have been incurred in the absence of the special prosecutor law." S.Rep. 97–496 at 18, U.S. Code Cong. & Admin.News 1982, p. 3554.

## II. THE COLUMBIAN ALLEGATION

On May 23, 1985, following the completion of a preliminary investigation, Deputy Attorney General D. Lowell Jensen [7] filed an application with the special division of the court requesting the appointment of an independent counsel to investigate the so-called "Columbian Allegation" against Donovan.

The substance of the Columbian Allegation centered on the accusation that Donovan, as vice-president of Schiavone Construction Company, (SCC), allegedly demanded and received a kickback from Columbian Steel Company. In 1976–1977, Donovan negotiated a contract for Columbian to broker steel (Hodgson Steel & Ironworks was to supply the steel) for a New York City subway construction project. Columbian submitted a low bid of $522 per ton of steel delivered to the job site. Schiavone Construction Company participated in the project as part of a joint venture and Donovan was responsible for procurement of construction materials. The kickback agreement was allegedly structured as follows: of the $522 per ton of steel charged for delivery to the job site, $490 was allocated to Hodgson, $10 per ton to Columbian as agent and the remaining $22 per ton to Donovan as a kickback. If true, the kickback arrangement may have contradicted Donovan's sworn congressional testimony, and grand jury testimony given in the earlier Independent Counsel investigation.[8]

The principal witness against Donovan was Gerald Meyer, the president and co-owner of Columbian. At the time of the Donovan investigation, Meyer had been convicted and was awaiting sentencing on felony charges unrelated to the investigation. The F.B.I. uncovered the Columbian Allegation in the course of its investigation into whether Columbian Steel was making illegal payments to public officials in New York and New Jersey. The F.B.I. first learned of the Columbian Allegation in its interviews of Ronald Singer, co-owner of Columbian.[9] Singer did not have first-hand knowledge of the kickback agreement and Meyer refused to be interviewed by the F.B.I. *Application of the Attorney General*, at 3–4 (May 23, 1985); *see also Report of the Independent Counsel* at 4–10 (October 22, 1987).

## III. ANALYSIS

Raymond Donovan asserts that the attorneys' fees he requests would not have been incurred "but for" the requirements of the Act and that such fees were reasonably incurred. Section 593(f) charges the court with the duty of evaluating fee applications to determine if such applications merit reimbursement. Upon receipt of the fee application, the court, pursuant to § 593(f)(2), forwarded the application to the Department of Justice for evaluation. The Department found the application facially deficient in demonstrating that the fees would not have been incurred but for the Act and documenting the reasonableness of the fee request.[10] Donovan submitted a supplemental application which responded

---

**7.** Attorney General Edwin Meese III recused himself from participation in the Donovan investigation and delegated responsibility for the investigation to the Deputy Attorney General.

**8.** The first Independent Counsel investigation, also conducted by Leon Silverman, was very extensive, but unrelated to the matters addressed in the Columbian allegation.

**9.** Singer agreed to cooperate with the F.B.I. investigation in exchange for a grant of immunity pursuant to 18 U.S.C. § 6001.

**10.** *See, supra,* note 6. In addition to noting that the original application was facially deficient,

the Department of Justice specifically declined to make any factual determinations concerning the reasonableness of the request. The Department stated:

> [S]ince, by [statutory] design, the Department of Justice is not directly involved in the proceedings which take place pursuant to an independent counsel's investigation, we are not in a position to evaluate the reasonableness, in factual terms, of the underlying items for which reimbursement is claimed.

Department of Justice Evaluation at 11–12.

The Department of Justice's position is puzzling in light of its 1987 recommendation to

to the objections raised by the Department of Justice to the original application. The court now evaluates all of Donovan's fee request submissions to determine what, if any, portion of the request will be granted.

## A. The "But For" Requirement

■ Donovan asserts that the application satisfied the "but for" requirement because the information gathered by the Independent Counsel prior to the date he incurred any fees would have led the Attorney General to terminate an ordinary investigation. The court is unpersuaded by this contention. The court, however, finds that the but for requirement is met on other grounds. Specifically, the court finds the provisions of the Act prevented the Attorney General from following normal Department of Justice procedures during the preliminary investigation. Had the Department followed normal procedures, the Attorney General could have quickly terminated the investigation—without Donovan incurring legal fees.

Donovan alleges compliance with the but for provision by virtue of the claim that:

If Mr. Donovan had not been a [high] public official, the Justice Department would not have conducted an investigation of the magnitude of that conducted by independent counsel Leon Silverman and his staff. In fact, if the Justice Department had been investigating an ordinary citizen, the information gathered by Mr. Silverman by July 1985 (nearly two years before Mr. Donovan incurred any of the fees in question) would have led it to drop the investigation.

Supplemental Application, at 1–2.

The court rejects this argument. The Columbian Allegation was substantial and

should have been investigated even if it involved a mere private citizen. The length of the investigation appears reasonable because of the existence of the unexplained $22 cushion in Columbian's bid. Meyer's Columbian Allegation accounted for the $22 as a kickback to Donovan. No other evidence, physical or testimonial, provided a legitimate explanation for the excess funds. Donovan declined to be interviewed and threatened to invoke the Fifth Amendment if called before the grand jury. *Report of the Independent Counsel* at 68. Thus:

[T]he only explanation offered by any of the witnesses for the allocation of the remaining $22.00 per ton was that of Meyer and Singer; to wit, that the bulk of the money was intended to be paid to Donovan as a kickback ...

*Id.* at 71. We find, however, although Donovan's proffered argument as to the "magnitude" of the Independent Counsel investigation fails to withstand scrutiny, the but for requirement is otherwise satisfied.

The Independent Counsel statute, which was in effect when the Deputy Attorney General conducted his preliminary investigation,[11] provided:

If the Attorney General, upon completion of the preliminary investigation, finds reasonable grounds to believe that further investigation or *prosecution* is warranted ... then the Attorney General shall apply to the Division of the Court for the Appointment of a [sic] Independent Counsel. In determining whether reasonable grounds exist to warrant further investigation *or prosecution* the Attorney General shall comply with the written or other established policies of

Congress when Congress was considering extending the Independent Counsel Act:

We would recommend that Section 593(f) [of the Bill] be amended to add a provision ... giving the Attorney General an opportunity to review and or comment upon a request for attorneys' fees. The Department's vast experience in the award of attorneys' fees would no doubt assist the division of the court in rendering a decision on this issue.

Letter of the Assistant Attorney General, Department of Justice, Office of Legislative Affairs, to

Peter W. Rodino, Jr., Chairman, Committee on the Judiciary, House of Representatives (August 31, 1987). H.R.Rep. 100–316, to accompany H.R. 2939, Sept. 23, 1987, p. 48.

11. The Ethics in Government Act Amendments of 1982, Pub.L. No. 97–409, 96 Stat. 2039 (1983) (enacted January 3, 1983), was in effect when the Deputy Attorney General conducted his investigation.

the Department of Justice with respect to the enforcement of criminal laws.[12]

28 U.S.C. § 592(c)(1) (emphasis added).

The application by the Deputy Attorney General for the appointment of Independent Counsel indicated that the decision to pursue prosecution would depend on whether "the allegation could be substantiated," and included the following important statement:

The Department of Justice's efforts to pursue this matter has been hampered by the limitations in the Act that preclude the Attorney General from convening grand juries, plea bargaining, granting immunity, or issuing subpoenas. As a result, several persons who would be in a position to credit or rebut the allegations have refused to be interviewed. Most importantly, the person [Meyer] who allegedly negotiated the kickback agreement with Donovan and who then purportedly made payments to Donovan has refused to be interviewed.

*Application of the Deputy Attorney General,* at 3–4, May 23, 1985.

The United States Attorneys' Manual, (USAM), promulgated by the Department of Justice, identifies the two central factors to be weighed in determining whether to commence or decline prosecution as follows:

The attorney for the government should commence or recommend federal prosecution if he/she believes that the person's conduct constitutes a federal offense *and* that the admissible evidence will probably be sufficient to obtain and sustain a conviction. . . .

*USAM* 9–27.220, ch. 27, p. 7 (June 15, 1984) (emphasis added). The comment to USAM 9–27.220 states that:

Both as a matter of fundamental fairness and in the interest of the efficient administration of justice, no prosecution should be initiated against any person unless the government believes that the person

probably will be found guilty by an unbiased trier of fact.

*Id.* at p. 8.

Significantly, where the initial decision to prosecute required a determination of the credibility of witnesses to substantiate the charges, the Deputy Attorney General indicated that he was "hampered" in making such a determination by the provisions of the Act. While the Independent Counsel Act provides that "the Attorney General shall comply with the written or other established policies of the Department of Justice with respect to the enforcement of criminal laws," [§ 592(c)(1)], in this case the provisions of § 592(a)(2) (1983) prevented him from complying with such policies.

The provision of the Act that the Deputy Attorney General referred to as hampering his ability to follow the requirements of the Act and normal Department of Justice procedure, to determine whether there existed "reasonable grounds to believe that further investigation or prosecution is warranted," was set forth in § 592(a)(2). It provided:

In conducting preliminary investigations pursuant to this section, the Attorney General shall have no authority to convene grand juries, plea bargain, grant immunity or issue subpoenas.

28 U.S.C. § 592(a)(2) (1983). If the Department of Justice were investigating a criminal violation by an ordinary citizen, it would not have been restricted by this limitation. The Department could have tested the credibility of the witnesses and determined whether the facts substantiated the charges by convening a grand jury, subpoenaing witnesses, plea bargaining, and granting immunity. However, under the limitations of the Act, the Deputy Attorney General could not follow normal procedures and felt compelled to request the appointment of an independent counsel.

In response to the application for the appointment of an independent counsel, the Division of the Court of appointed Leon

---

**12.** The existing statute, 28 U.S.C. § 592(c)(1), approved on December 15, 1987, 101 Stat. 1296, eliminates "prosecution" as a factor to be con-

Silverman, of the New York Bar, to conduct the investigation.[13] Upon completion of the investigation, the Report of the Independent Counsel found:

> [I]t was unlikely that a conviction for such crimes could have been obtained, and that accordingly, an indictment of Donovan for such crimes was not warranted.

*Report* at 71. The Report stated:

> [T]here were a number of factors which made it unlikely that a conviction of Donovan could have been obtained, including witnesses with memories which have faded over the years, a lack of sufficient credible and corroborative evidence, and the fundamental inconsistencies and contradictions in the various versions of the Columbian Allegation discussed above. Despite the view of the Independent Counsel, [he submitted] the matter [ ] to the grand jury, which declined to indict.

*Id.,* 71–72. The Independent Counsel further concluded:

> [T]he documentary and physical evidence, while circumstantially corroborative of the Columbian Allegation did not sufficiently and independently establish that Donovan negotiated and accepted a

kickback from Meyer ... and the grand jury came to the same conclusion.

*Id.* at 73.

Therefore, it appears that Donovan was subjected to a very extensive and expensive Independent Counsel investigation of a criminal offense where an ordinary citizen might only have been subjected to a non-public summary investigation by the Department of Justice, with no publicity. The Department of Justice could have found either through its own investigation or through a grand jury proceeding, with the grant of immunity to the recalcitrant witnesses, that the principal witnesses were not credible and that there were no facts provable beyond a reasonable doubt that justified a prosecution—the same finding subsequently made by Independent Counsel and the grand jury.

In considering the award of attorneys' fees based on the present statute, the legislative history reflects that Congress intended that the court grant reimbursement for attorneys' fees sparingly:

> The change S.2059 [the 1983 amendments] makes in the standards which trigger a preliminary investigation and an appointment of a special prosecutor are designed to ensure that covered officials will not be subjected to a more

---

sidered in determining whether further investigation is warranted.

**13.** The Deputy Attorney General's Application requested that an independent counsel investigation of the Columbian Allegation remain confidential during the pendency of Raymond Donovan's criminal trial in Bronx County, New York:

> In the instant matter, this allegation [the "Columbian Allegation"] against Donovan has not become known publicly, and it would not appear to serve the interests of justice to release a copy of this application. Rather, *continued secrecy* concerning this matter may help protect the right of the prosecution and the defense to a fair trial of the charges against Donovan and others filed by a grand jury in Bronx County, New York. In that pending matter, Donovan, Schiavone Construction Company, officials of Schiavone, and others are charged criminally with fraud and false statements in connection with the company's alleged fraudulent claim that one of its subcontractors qualified as a minority business enterprise as required by law, and are charged with larceny by inflating claims

of expenses incurred by one of its subcontractors. The charges were filed on September 24, 1984 and trial, which has been delayed by numerous pretrial motions, is expected to commence at the conclusion of a hearing on pre-trial motions which began on May 20, 1985. The trial may continue for two to three months. On May 8, 1985, the trial judge ordered prosecutors and defense attorneys to refrain from publicly discussing the merits of the criminal charges against Donovan and his co-defendants. Additionally, *continued secrecy* may assist the investigative efforts of an Independent Counsel. Accordingly, leave to release this application is not being sought at this time.

Application of the Attorney General at 5–6 (emphasis added). Obviously, "continued secrecy" would be jeopardized if a federal grand jury were convened to investigate the charges. Therefore the Independent Counsel investigation did not fully begin until after Donovan's acquittal in the Bronx County trial on May 25, 1987.

rigorous application of the criminal law than is applied to other citizens. Thus, the Committee believes that reimbursement of attorneys' fees would be warranted, if at all, only in rare instances. S.Rep. 97–496 at 19 (1982), U.S.Code Cong. & Admin.News 1982, p. 3555. However, as the statute existed when the preliminary investigation in this case was conducted by the Deputy Attorney General, Donovan was "subjected to a more rigorous application of the criminal law than [was] applied to other citizens." The Attorney General, in the required preliminary investigation, was without authority, by virtue of § 592(a)(2), "to convene grand juries, plea bargain, grant immunity, or issue subpoenas." *Id.*

In the instant case, the Deputy Attorney General found himself unable to comply "with the written or other established policies of the Department of Justice with respect to the [regular] enforcement of criminal laws" against citizens who were not high level government officials. § 592(c)(1). The Deputy Attorney General was deprived of his normal means of determining credibility and other relevant facts. The Deputy Attorney General's disability was critical in this case because the decision to prosecute turned largely, if not completely, upon determining the credibility of witnesses.[14]

This led to Donovan being subjected to the highly publicized procedure of an Independent Counsel investigation with the *resulting* public report of the investigation even though no indictment was brought. If normal Department of Justice procedures had been followed in Donovan's case, the same determination could have been made by the Department following a grand jury investigation and no public report of the grand jury investigation would have

been authorized. *Hammond v. Brown,* 323 F.Supp. 326 (N.D.Ohio 1971); *Application of United Electrical, Radio and M. Workers,* 111 F.Supp. 858 (S.D.N.Y.1953). As we noted in *Fund for Constitutional Gov. v. National Archives,* 656 F.2d 856, 863 (D.C.Cir.1981), "the decision to prosecute an individual for a crime is one entrusted solely to the prosecutor's discretion and rarely subject to judicial review or public scrutiny."

It must therefore be concluded that Donovan "incurred ... attorneys fees which would not have been incurred but for the requirements of [the Act]." § 593(f)(1).

**B. The Reasonable Fee Requirement**

■ Having found that Donovan satisfied the but for requirement, the court must now determine what portion of the requested fees were reasonably incurred and thus qualify for reimbursement. In determining whether fees are reasonable, courts ordinarily focus on two questions: (1) whether the attorneys charged a reasonable hourly rate and (2) whether the time attorneys logged on the case was reasonable—*i.e.,* did the attorneys waste or otherwise unnecessarily spend time on the matter. We conclude that Donovan's attorneys charged a reasonable hourly rate,[15] but, however, billed for time which was either not reasonably necessary or sufficiently documented.[16]

Donovan's request for reimbursement was accompanied by affidavits of his attorneys supporting his request for compensation. Donovan was represented by William O. Bittman of Pierson, Ball & Dowd (Pierson, Ball) of Washington, D.C., and Paul J. Curran of Kaye, Scholer, Fierman, Hays & Handler (Kaye, Scholer) of New York City. The fee application states that Donovan

---

**14.** The Independent Counsel found: "Meyer is the only individual who has direct, personal knowledge of the central details of the Columbian Allegation." Report of the Independent Counsel at 55. The case, therefore, would rise and fall essentially on Meyer's credibility and persuasiveness. Upon interviewing Meyer, the central witness against Donovan, the Independent Counsel quickly found him to be "an ailing and aging man whose recollection of events ... was often clouded and imperfect." *Report* at

72. Moreover, Meyer's status as a convicted felon awaiting sentencing might undercut his credibility. *Id.*

**15.** *See, infra,* note 21 and accompanying text.

**16.** *See* appendix. The Court has provided an appendix which contains a chart documenting time and fees disallowed by the court.

has paid $112,281.56 in fees and expenses: Attorneys' fees and expenses of $79,228.90 on account of the work of Pierson, Ball, and $33,052.66 in fees and expenses on account of the work of Kaye, Scholer. The Supplemental Submission included affidavits from his two lead counsel, Bittman and Curran, and from highly qualified counsel of the New York and Washington Bars, Robert B. Fiske, Jr. and Daniel A. Rezneck. This court was also provided with exhibits and further information documenting the services rendered by the two law firms, Pierson, Ball and Kaye, Scholer. Principally, the firms submitted their time sheets which contained an itemized bill and brief description of services rendered.

The statute authorizing reimbursement of attorneys' fees leaves the determination of the amount of reimbursement to the discretion and judgment of this court, *i.e.,* "the division of the court *may* ... award reimbursement for those reasonable attorneys' fees..." § 593(f)(1) (emphasis added).

The Conference Committee Report of November 20, 1987, to accompany H.R. 2939, Rep. No. 452, 100th Cong., 1st Sess., 31 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2150, 2197, of the House of Representatives states:

> [T]he hourly rate is left to the judgment of the special court using the standard of reasonableness. In determining the proper rate, the special court should consider the prevailing community standards and any helpful case law. The conferees encouraged the special court to obtain the Justice Department's opinion on the reasonableness of the hourly rate being claimed by counsel in a particular case.
>
> Also in determining the amount of the underlying fees to be awarded, the special court should pay particular attention to the reasonableness of the underlying items. Reimbursable attorneys' fees are for reasonable legal expenses arising from the independent counsel process.

Attention should also be paid to the number of hours claimed for performing particular services, again to ensure the reasonableness of the underlying item.

We interpret the term "reimbursement" to mean actual fees incurred by the subject and the term "incurred" to mean actual fees which the subject paid or for which he is liable. Our interpretation of the reasonableness limitation will in turn be influenced by the existing law on determination of a reasonable attorneys' fee:

> There are over 100 separate statutes providing for the award of attorney's fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all these statutes is that the attorney's fee must be "reasonable."

*Pennsylvania v. Delaware Valley Citizens' Council For Clean Air,* 478 U.S. 546, 562, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986). *See also Kreimes v. Department of Treasury,* 764 F.2d 1186 (6th Cir.1985) (Standards set out in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), are applicable generally to attorneys' fee cases.). This court, using the standard of reasonableness to be applied to every feature of the amount requested, will ordinarily award an amount which will be equal to the lodestar [17] figure in such litigation.

In *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Court, citing the legislative history of the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988 and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), "concluded that 'product of reasonable hours times a reasonable rate' normally provides a 'reasonable' attorney's fee within the meaning of the statute [§ 1988]." *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (quoting *Hensley* at 434, 103 S.Ct. at 1939). Additionally, the Court stated that *Hensley* "recognized" that an up-

---

**17.** The lodestar figure is the product of the number of hours reasonably expended in a representation and a reasonably hourly rate. The prevailing community compensation level is deemed to be a reasonable rate. The lodestar analysis was developed by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir.1973). *See Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1522 (D.C.Cir. 1988) (*en banc*).

ward adjustment to the normal award may be justified in an exceptional case. *Id.* However, the *Blum* Court noted that "[t]he burden of proving that [an upward] adjustment is necessary to the determination of a reasonable fee is on the fee applicant." *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548.

The *Blum* formulation has been summarized by this court as a three part analysis: "(1) determination of the number of hours reasonably expended in litigation; (2) determination of a reasonable hourly rate or 'lodestar'; and (3) the use of multipliers as merited." *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C. Cir.1988) *(en banc)*—hereafter *SOCM. See also, Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564–65, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986). In the instant case, Raymond Donovan has not requested an upward adjustment of the lodestar amount. Moreover, the court will not make any downward adjustment of *its* calculation of the lodestar—*i.e.,* the deductions the court will make from Donovan's fee request are made in determining the reasonable hours expended. Thus, the court need not address the issue of whether any adjustments are "merited."

The body of law developed pursuant to 42 U.S.C. § 1988 and other similar federal attorneys' fee statutes will prove useful to attorneys in preparing applications for fees. The attorneys' fees provision of the Civil Rights Act, 42 U.S.C. § 1988, has been interpreted to include reasonable expenses usually billed to the client in addition to the hourly rate. *See Ramos v. Lamm,* 713 F.2d 546, 559 (10th Cir.1983). In this Act the term "expenses" is used in the legislative history interchangeably with the term "attorneys' fees." The obvious intent of the Act is to reimburse public officials for expenses incurred in the scrutiny of their affairs when the investigation exceeded that to which a private citizen would be subjected.

Under the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988,[18] attorneys' fees are based on a "market rate" analysis and we are applying an "actual but reasonable rate" analysis to the determination of reimbursable costs. "The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the revelant community." *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547;[19] *see also Bebchick v. Washington Metropolitan Area Transit Com'n,* 805 F.2d 396, 402 (D.C.Cir.1986); *Jordan v. Multinomah County,* 815 F.2d 1258, 1262 (9th Cir.1987).

■ Under the market rate analysis only those expenses actually billed to normal clients are includable in an attorneys' fee award. *See Ramos v. Lamm, supra.* The decisions cited above, however, are not controlling precedents for this court's application of the Independent Counsel Reauthorization Act. This court will not impose a requirement that the subject has paid the attorneys' fee in question before reimbursement can be sought. It will only require that the subject be legally liable for fees incurred by representation during the investigation. In this case no question is raised as to compliance with the latter standard since the fees have been paid on the basis billed.

The foregoing analysis also applies to the rates charged for services of paralegals

---

**18.** 90 Stat. 2641, 94 Stat. 2330.

**19.** The Supreme Court has "recognize[d] ... that determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. The difficulty lies in the wide variation in experience, skill, reputation, practice area among lawyers in any given community. Thus, the *Blum* Court observed:

In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. A rate determined in this way is normally deemed to be reasonable ...
*Blum* at 895–96, n. 11, 104 S.Ct. at 1547 n. 11.

and law clerks.[20] The use of paralegals and law clerks has become an accepted practice among law firms. Often the work done by them was formerly done by junior associates at much higher rates. The use of paralegals and law clerks results in lower fees to the client and thus should result in a lower request for reimbursement.

1. *Hourly Rates.*

Donovan's attorneys here have requested their usual hourly rates for their services. *See* Bittman affidavit at 5; Curran affidavit at 6. Supporting affidavits attached to the Supplemental Application by independent and well qualified counsel assert that these rates are within the range of rates usually charged by attorneys in the Washington, D.C. and New York City areas. We therefore find the hourly rates charged by Pierson, Ball and Kaye, Scholer to be reasonable. The firms' rates range, for Pierson, Ball from $250.00 per hour (Bittman in Washington, D.C.) to $65.00 per hour and, for Kaye, Scholer from $350.00 per hour (Curran in New York City) to $60.00 per hour. These fees—while very high, especially for the lead counsel—were the attorneys' usual hourly rates and all rates billed conformed with the fees charges by attorneys of comparable qualifications in their respective communities. *See Blum,* 465 U.S. at 895, 104 S.Ct. at 1547.[21]

2. *Reasonable Number of Hours Spent on the Representation.*

The court's determination of the reasonableness of the hours billed will consist of a two-step analysis. First, we shall examine the fee application in light of the Act which requires the court to determine whether the fees charged were incurred during the independent counsel investigation and were reasonably related to a defense to such investigation. Second, we shall examine the fee request in light of general case law on what constitutes hours reasonably incurred.

■ At the outset, the court will deduct from Donovan's fee request hours which were not contemplated by § 593(f) as fees incurred during the Independent Counsel's investigation. That is, hours which both firms billed for activities which were unnecessary to the substantive defense of Raymond Donovan against the charges the Independent Counsel was investigating. Because these services were not rendered for activities reasonably related to Donovan's defense, they cannot be subject to reimbursement under § 593(f).

■ In reviewing the time sheets for such charges, we have not approved attorneys' fees paid to Pierson, Ball for the following items: (1) Raymond Donovan's letter to the Independent Counsel explaining his refusal to submit to a "formal interview." This letter was transmitted to the Independent Counsel *after* Donovan's attorneys had communicated his refusal to testify [22] and therefore was unnecessary to the defense of Donovan. *Letter* at 1. The letter acknowledges that its motivation was "personal" and not legal. *Id.* The charges concerning the Donovan letter total $1,020.50. (2) Pierson, Ball's time sheets

---

**20.** We note that the law of this Circuit holds that paralegals and law clerks are compensated at their market rate. *See Wilkett v. I.C.C.,* 844 F.2d 867, 877 (D.C.Cir.), *reh'g en banc denied,* 857 F.2d 793 (1988); *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 54 n. 7 (D.C.Cir. 1987), *vacated in part on other grounds,* 857 F.2d 1516 (D.C.Cir.1988) (*en banc*). The Supreme Court, in *Missouri v. Jenkins,* —— U.S. ——, 109 S.Ct. 218, 102 L.Ed.2d 209 (1988), is presently considering whether fees incurred for the work of paralegals and law clerks should be reimbursed at their market rate or at their cost to the firm. We are, of course, bound by Circuit precedent unless the Supreme Court issues a contrary ruling.

**21.** We are compelled to recognize that Donovan, due to the very serious nature of the charges against him, reasonably retained, and paid, firms of the caliber of Pierson, Ball and Kaye, Scholer with lead counsel such as Bittman and Curran—*i.e.,* attorneys of the highest competence in their practice area with commensurate hourly rates.

**22.** Donovan's attorneys informed the Independent Counsel that he declined to be interviewed prior to Donovan's September 30, 1987 letter to the Independent Counsel. On October 8, 1987, Donovan's attorneys "advised" the Independent Counsel "that Donovan would take the Fifth Amendment if subpoenaed ..." Report of the Independent Counsel at 67–68.

also denote charges ($1,873.50) for hours expended in responding to press inquiries and drafting press releases. Media related activity has no bearing on the operation of an independent counsel's investigation and thus is not reasonably related to a defense to such investigation. This holding is in accord with our previous Order *In re Edwin Meese III*, Division No. 84–1 (June 7, 1985). In *Meese*, this court excluded fee requests for media related activity due to "the nonreimbursability of time spent dealing with the media in the course of represent[ation] ..." *Id.* (3) Pierson, Ball's billings ($963.00) for services rendered described as "conflict of interest" research are also not reimbursable. There has been no indication as to how conflict of interest research is relevant to this matter.

■ We had some misgiving about the expenditures, $3,650, with respect to the "[r]esponse to the Report of [the] Independent Counsel." Such expenditures, strictly speaking, were not incurred "during [the] investigation" as required by § 593(f), the Independent Counsel's investigation terminates with his filing of a Final Report. We, however, find such expenses to be reimbursable since the Act provides that subjects of investigations may file "comments and factual information [for inclusion in] ... an appendix to such final report." § 594(h).

In determining the amount to be deducted from Kaye, Scholer's fees, the court has, as with Pierson, Ball, subtracted for (1) services rendered in connection with the drafting of press releases and other media related activity—($728)—and (2) for services rendered in regard to Donovan's letter to Independent Counsel Silverman explaining his refusal to testify—($290.50).

■ Turning to issues which generally affect attorneys' fee requests, this court will require that fee applications include contemporaneous time records of hours worked and rates claimed, plus a detailed description of the subject matter of the work with supporting documents, if any. *See National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1326 (D.C.Cir.1982); ("[C]asual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees. Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney."); *see also Grendel's Den Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984); *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir.1983); *Lindy Bros. Builders v. American Radiator & Standard Sanitary Supply Co.*, 540 F.2d 102, 109 (3d Cir.1976) (*en banc*).

This requirement is particularly apt when the fee requirements will be satisfied from the United States Treasury. We must strictly construe a waiver of sovereign immunity. *See, United States v. Mottaz*, 476 U.S. 834, 851, 106 S.Ct. 2224, 2234, 90 L.Ed.2d 841 (1986) ("[A] waiver of sovereign immunity cannot be lightly implied ...") (citations omitted); *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981) ("[T]his Court has long decided that limitations and conditions upon which the Government consents to be used must be strictly observed and exceptions thereto are not to be implied.") (citations omitted); *United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) ("[W]e should not take it upon ourselves to extend the waiver [of sovereign immunity] beyond that which Congress intended."); *In re Jordan*, 745 F.2d 1574, 1576 (D.C.Cir.1984) ("Waivers of sovereign immunity must be strictly construed.").

Additionally, where the "documentation of hours is inadequate, the ... court may reduce the award accordingly." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). *See also Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir.1988); *United Slate Tile & Composition v. G & M Roofing*, 732 F.2d 495, 502 n. 2 (6th Cir.1984) (Supporting documentation "must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended ...").

■ We have examined all the documentation provided by Donovan's attorneys and find that a number of billing entries are not sufficiently documented. On several occasions the description of services rendered is confined to "legal issues," "conference re all aspects" or "call re status." Such description fails to provide the court with any basis "to determine with a high degree of certainty" that the hours billed were reasonable. The vague description does not allow the court to evaluate whether the time billed was spent on issues that have been found not within the contemplation of § 593(f) and this compels the court to exclude such hours.

Examples of such disallowed time include: July 27, 1987, August 11, 1987, August 28, 1987, October 16, 1987, October 19, 1987 and October 20, 1987. Additionally, vague descriptions force the court to partially disallow some other time claimed. Examples of partially disallowed times include: August 12, 1987, (1 hour), August 19, 1987 (1 hour), September 3, 1987 (1 hour), September 14, 1987 (1 hour) and September 23, 1987 (1.2 hours). The partially disallowed time involves billing entries for a large block of time and the description contained some references to specific work and a general reference. We credit the specific reference; we cannot credit the general reference.

In addition to the above deductions for vagueness, we are also compelled to deduct from the fees claimed by both firms charges incurred when attorneys held conferences and teleconferences with persons referenced as "Geiser" and "Wells." The application fails to document who these individuals are or the nature of their relationship to the investigation; consequently,

we cannot evaluate whether such fees were reasonably incurred.[23]

Additionally, we note the Supreme Court's admonition in *Hensley* that "[t]he district court should also exclude from the initial fee application hours that were not 'reasonably expended.'" *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939 [Citing S.Rep. No. 94–1011 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908—The Senate Report on the Civil Rights Attorneys' Fee Award Act of 1976, *supra*.]. Because "[c]ases may be overstaffed," the *Hensley* Court directed courts to scrutinize fee requests for "excessive, redundant or otherwise unnecessary" hours "which firms would have excluded from bills to their own clients." *Id.* This Circuit has stated: "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 641 F.2d 880, 891 (1980) (*en banc*) (emphasis in original). Moreover, as the Eleventh Circuit observed: "[g]eneralized statements that time spent was reasonable ... of course are not entitled to much weight." *Norman v. Housing Authority of City of Montgomery, supra*, at 1301 (citing, *Hensley*, 461 U.S. at 439 n. 15, 103 S.Ct. at 1942 n. 15).

The case of *Laffey v. Northwest Airlines*, 746 F.2d 4 (D.C.Cir.1984) (*partially overruled on other grounds*),[24] provides an example of a court excluding redundant fee requests. In *Laffey*, Mary Pat Laffey, *et al.*, and counsel, the Washington, D.C. law firm of Bredhoff & Kaiser, brought a successful Title VII action against Northwest. Following the trial on the merits, the district court ordered counsel to negotiate on the amount of attorneys' fees to be awarded to the plaintiff. Bredhoff & Kaiser hired the Washington, D.C. law firm of Arnold & Porter to represent them in the

---

**23.** The court will not deduct for fees incurred in conference with a third party who reasonably contributed to the conference where either Geiser or Wells also attended the conference. The fees incurred at such conferences reflect work done with attorneys and others which the court has credited. In other words, the presence of either Geiser or Wells does not render an otherwise reasonable conference unreasonable.

**24.** *Save Our Cumberland Mountains, supra*, overruled *Laffey* insofar as *Laffey* provided that attorneys who quote certain clients hourly rates lower than their normal rates are held to the quoted rate when attempting to recover attorneys' fees. *SOCM*, provided that the attorneys may recover their ordinary hourly rate notwithstanding the fact that they quoted their clients a discounted rate. *SOCM* at 1524.

negotiations. The negotiations failed and the parties submitted widely divergent calculations of fees. One source of disagreement between the parties was the hiring of Arnold & Porter. Northwest asserted such hiring caused unnecessary duplication of work by Bredhoff & Kaiser and Arnold & Porter. The *Laffey* district court judge excluded hours that he believed were duplicative stating:

> The Court declines to pass judgment on the propriety of Bredhoff & Kaiser's decision to retain separate fee counsel; it leaves to counsel the professional judgment as to how its fee application is most effectively prepared. Counsel is not free, however, to exercise its judgment in a fashion that unnecessarily inflates the losing party's fee liability, *e.g.* by injecting an additional layer of attorneys into the case.

*Laffey*, 572 F.Supp. 354, 369 (D.D.C.1983).

The district court excluded 125 hours out of 245 hours of inter-firm meetings concerning the fee application. This ruling was affirmed by this Circuit. *Laffey*, 746 F.2d at 29–30. Thus, *Laffey* outlines a situation where a court should exclude fee requests because of overstaffing on a case. *See also Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988) ("Redundant hours generally occur where more than one attorney represents a client."); *Singer v. Shannon & Luchs Co.*, 779 F.2d 69, 70–71 (D.C.Cir.1985) ("Absent some explanation, a fee attributable to expenses incurred by several attorneys in attendance at hearings at which only a single attorney's presence arguably was necessary would appear to be excessive."); *Grendel's Den v. Larkin*, 749 F.2d 945, 953 (1st Cir.1984) ("We see no justification for the presence of two top echelon attorneys at each proceeding."); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 623 F.Supp. 21, 24 (D.C.Ariz.1985) (*reversed on other grounds*, 826 F.2d 837 (9th Cir.1985) ("If more than one attorney is involved, the trial judge in determining the

amount of attorneys' fees must consider the possibility of duplication of effort.") (citations omitted).

In addition to the above mentioned deductions, we have also excluded the fees charged by Kaye, Scholer between July 28, 1987 and October 22, 1988. This period represents the legal fees billed by Kaye, Scholer in responding to the Independent Counsel's subpoenas and conducting the substantive defense to the allegation that Donovan committed perjury. The services provided by Kaye, Scholer duplicate the services provided by Pierson, Ball. During this period, both firms engaged in extensive research and legal analysis of perjury law. The supporting affidavit states: "[t]he key issue involved was whether or not Mr. Donovan had committed perjury ..." The time sheets of both firms are replete with references to work done researching "legal issues," "perjury issues" and "materiality" (an element of the perjury offense). This research was duplicative.

Additionally, the court will deduct one-third (⅓) of Pierson, Ball's billings for services rendered between July 27, 1987 and October 22, 1987 that were incurred when Pierson, Ball attorneys held conferences with attorneys from Kaye, Scholer. We view this time as also being duplicative in light of the numerous intra-firm conferences at Pierson, Ball.[25]

Similarly, we have excluded the work done by Pierson, Ball in advising Donovan on whether to waive the statute of limitations on the perjury charge. Donovan incurred these fees in March of 1987. The Independent Counsel sought the waiver to prevent him from being forced to actively investigate the Columbian Allegation while the Bronx County trial was still pending. Kaye, Scholer also billed for this time and we find that one firm was fully capable of competently advising Donovan on the statute of limitations matter. Thus these services were also duplicative.

---

**25.** We shall only deduct fees incurred when Pierson, Ball attorneys were in conference with Kaye, Scholer attorneys alone or with Kaye, Scholer attorneys and undocumented individuals. Where Pierson, Ball attorneys were in conference with Kaye, Scholer attorneys *and* other individuals the court has found to be reasonable conferees, we shall make no deduction.

■ While a subject of an independent counsel investigation has every right to retain as many attorneys as he chooses, we consider, for the purpose of determining the proper award of reasonable attorneys' fees, the retention of two very competent attorneys with their accompanying staffs at major law firms excessive and therefore an unreasonable expenditure. The court cannot see any reason why one firm could not have handled the entire case. We recognize that both legal counsel successfully defended Donovan in the Bronx County criminal prosecution; this fact alone, however, does not render the hiring of both firms reasonable.

## IV. CONCLUSION

For the foregoing reasons, we award Raymond J. Donovan $72,875.06 in reasonable attorneys' fees and expenses.[26] The computation of the amount is set forth in the appendix.

*Judgment accordingly.*

## APPENDIX

### Deductions By Subject Matter

#### I. *Conflict of Interest*

| Attorney | Time Deducted | Rate/Per Hour | Amount Deducted |
|---|---|---|---|
| A. Pierson, Ball | | | |
| 1. D.E. Burkley | 2.0 | $150.00 | $ 300.00 |
| 2. L.C. Johnson | 7.8 | $ 85.00 | $ 663.00 |

#### II. *Media Related Activity*

| | | | |
|---|---|---|---|
| A. Pierson, Ball | | | |
| 1. W.O. Bittman | 3.1 | $250.00 | $ 775.00 |
| 2. D.E. Burkley | 1.7 | $150.00 | $ 225.00 |
| 3. M.V. Huff | 1.4 | $ 90.00 | $ 126.00 |
| 4. M.A. Choman (Paralegal) | .3 | $ 65.00 | $ 19.50 |
| B. Kaye, Scholer | | | |
| 1. P.J. Curran | 2.08 | $350.00 | $ 728.00 |

#### III. *Donovan Letter*

| | | | |
|---|---|---|---|
| A. Pierson, Ball | | | |
| 1. W.O. Bittman | 2.2 | $250.00 | $ 550.00 |
| 2. D.E. Burkley | 1.2 | $150.00 | $ 180.00 |
| B. Kaye, Scholer | | | |
| 1. P.J. Curran | .83 | $350.00 | $ 290.50 |

#### IV. *Insufficient Documentation*

| | | | |
|---|---|---|---|
| A. Pierson, Ball | | | |
| 1. W.O. Bittman | 44.9 | $250.00 | $11,225.00 |
| 2. D.E. Burkley | 1.5 | $150.00 | $ 225.00 |

#### V. *Duplication of Work*

| | | | |
|---|---|---|---|
| A. Pierson, Ball | | | |
| 1. W.O. Bittman | 17.6 | $250.00 | $ 4,400.00 |
| B. Kaye, Scholer | | | |
| 1. P.J. Curran | 25.07 | $350.00 | $ 8,774.50 |
| 2. B. Margolius | 25.01 | $200.00 | $ 5,002.00 |
| 3. Lexis (Computer) | 2.76 | $200.00 | $ 552.00 |
| 4. B. Zolot | 47.42 | $110.00 | $ 5,216.20 |
| 5. H. Sideris (Paralegal) | .58 | $ 60.00 | $ 34.80 |
| 6. Law Clerk | 1.5 | $ 60.00 | $ 90.00 |
| TOTAL DEDUCTION— | | | $39,406.50 |

**26.** The court has not deducted any amount from Donovan's claimed expenses.