**In re Oliver L. NORTH (Reagan Fee Application).**

**Division No. 86–6.**

United States Court of Appeals, District of Columbia Circuit.

Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended.

Sept. 3, 1996.

Before: SENTELLE, Presiding Judge, BUTZNER and FAY, Senior Circuit Judges.

## ORDER

PER CURIAM.

This matter coming to be heard and being heard before the Special Division of the Court upon the application of Ronald Reagan for reimbursement of attorneys' fees and costs pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994), and it appearing to the court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is in part well taken, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that the United States reimburse Ronald Reagan for attorneys' fees and expenses he incurred during the investigation by Independent Counsel Lawrence E. Walsh in the amount of $562,111.08 this 3rd day of September, 1996.

Opinion for the Special Court filed PER CURIAM.

PER CURIAM:

Former President Ronald Reagan petitions this court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994) ("the Act"), for reimbursement of attorneys' fees and expenses he incurred during and as a result of the Iran/Contra investigation conducted by Independent Counsel ("IC") Lawrence E. Walsh. The petitioner seeks reimbursement in the amount of $777,651.79 for representation from September 14, 1990, to January 21, 1994. After considering the petition, we find that the request is reasonable in part and

that the former President is entitled to attorneys' fees and expenses in the amount of $562,111.08.

## I. BACKGROUND

Consideration of this petition does not require repetition of the details of the Iran/Contra investigation, the facts of which are generally collected in cases cited in *In re North (Shultz Fee Application)*, 8 F.3d 847, 849 (D.C.Cir. Spec. Div.1993) (per curiam).[1] In November 1986, information about the sale of arms to Iran and the diversion of profits from these sales to the Contras in Central America began to emerge. On December 4, 1986, Attorney General Meese requested appointment of an independent counsel and, on December 19, 1986, this court appointed Lawrence E. Walsh to investigate whether Oliver L. North, other government officials, or individuals committed a violation of any federal criminal law relating to the transfer of arms to Iran, the diversion of proceeds from such arms sales to insurgents in other countries, and the provision of support for the Contras. IC Walsh filed his Final Report on August 4, 1993, and comments by individuals mentioned in the Report were due by December 3, 1993. The Final Report was released to the public on January 18, 1994. In the Final Report, IC Walsh devoted a chapter to Reagan, in which he concluded that "it could not be proved beyond a reasonable doubt that President Reagan knew of the underlying facts of Iran/contra that were criminal or that he made criminal misrepresentations regarding them." Final Report of the Independent Counsel for Iran/Contra Matters, Aug. 4, 1993, at 445.

As directed by section 593(f) of the Act, we have submitted Reagan's fee application to the Attorney General and to IC Walsh for evaluation. We thank the Attorney General and IC Walsh for their written evaluations of Reagan's fee request, which we have considered in reaching our decision.

## II. ANALYSIS

Reagan is entitled to attorneys' fees under the Act if he if he satisfies section 593(f)(1), which allows the "subject of an investigation conducted by an independent counsel," "if no indictment is brought against such individual pursuant to that investigation," to request reimbursement for "those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]." 28 U.S.C. § 593(f)(1). As this court has previously held, a successful petitioner must thus demonstrate that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*In re North (Cave Fee Application)*, 57 F.3d 1117, 1119 (D.C.Cir. Spec. Div.1995) (per curiam). We will address each of these requirements in turn.

### A. Reagan's "Subject" Status

Reagan, who was not indicted, states that based on the Final Report's description of the investigation's focus on him, it is clear that he was a subject. Reagan notes that not only did IC Walsh devote a whole chapter to scrutinizing his conduct, the entire Report is filled with statements and assertions concerning the investigators' activities with respect to him. Although in a July 30, 1992, letter IC Walsh notified Reagan's attorney that he no longer regarded Reagan as a subject of the investigation, Reagan asserts that he actually remained a subject afterwards because the letter did not foreclose the possibility that new developments might cause IC Walsh to change his mind and, more importantly, subsequent events and the Final Report reveal that Reagan never ceased to be a subject. Reagan emphasizes

---

1. We have previously cited decisions of the Special Division as coming from the D.C. Circuit, *e.g.*, (D.C.Cir.1996). For reasons of clarity, we now adopt a new citation form, (D.C.Cir. Spec. Div.1996), which will distinguish Special Division decisions from regular D.C. Circuit decisions.

that after July 30, 1992, IC Walsh continued to make statements suggesting that he remained under scrutiny. For example, after President Bush pardoned Secretary of Defense Weinberger and others, Walsh publicly accused Reagan of having had a deliberate intent to violate the Arms Export Control Act and of deliberately defying statutory bans on selling weapons to countries that support terrorism.

The Attorney General agrees that Reagan was a subject throughout the duration of IC Walsh's investigation. IC Walsh acknowledges that on July 30, 1992, he notified Reagan that he was no longer a subject. Regarding his later statements alleging that Reagan broke certain laws, Walsh maintains that the alleged violations were of civil, not criminal, laws and that he did not mean to suggest that he was reopening the investigation of Reagan.

As we determined in *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1079 (D.C.Cir. Spec. Div.1993) (per curiam), an individual qualifies as a subject if his conduct was being examined by the grand jury "in a way that would lead a reasonably counseled person at the time of incurring the fees to believe that there was a realistic possibility that he would become a defendant." The Final Report makes it clear that Reagan had a reasonable basis to believe that there was a realistic possibility that he would become a defendant, and he therefore plainly qualifies as a subject under the Act. We must also determine, however, whether he retained his subject status for the entirety of IC Walsh's investigation. *See, e.g., In re Mullins (Mullins Fee Application)*, 84 F.3d 459, 463–64 (D.C.Cir. Spec. Div.1996) (per curiam) (concluding that Mullins did not retain subject status after IC's letter stating that he did not intend to seek charges against her and, based on current information, he did not expect her status to change).

In *Shultz*, 8 F.3d at 850, the court considered three factors when it determined that IC Walsh's September 17, 1992, general statement that he would seek no further indictments did not end Shultz's subject status. The first factor was that the IC's statement contained the caveat that, in the absence of further developments, there would be no new indictments. *Id.* The second factor was that IC Walsh actually did obtain indictments after this statement, which demonstrated that the possibility of new developments was not "sufficiently remote to defeat the objective reasonableness of a determination by Shultz and his counsel that there remained a realistic possibility that the scope of the investigation encompassed his conduct in such a fashion as to make him a potential defendant." *Id.* The third factor, which the court deemed "perhaps the most compelling one," was that Shultz's attorney asked IC Walsh whether Shultz remained a subject and Walsh had, until Shultz filed his fee application, "not retreated from the proposition that Shultz remained a subject." *Id.*

The instant case resembles the situation in *Shultz* more closely than the one in *Mullins*. IC Walsh obtained other indictments after he told Reagan that he was no longer a subject, demonstrating that his investigation was still active, and Walsh admits in his evaluation of Reagan's fee petition that if witnesses had changed their testimony he would have prosecuted Reagan. A potential change in a witness' testimony, which is always a theoretical possibility, might not be enough by itself to keep a prior subject under a "reasonable apprehension of prosecution" sufficient to retain his subject status. *In re North (Gadd Fee Application)*, 12 F.3d 252, 256 (D.C.Cir. Spec. Div.1994) (per curiam). However, when this factor is coupled with IC Walsh's subsequent public accusations that Reagan broke the law, it indicates that the possibility of new developments was not "sufficiently remote to defeat the objective reasonableness of a determination" by Reagan that there was a realistic possibility that the scope of IC Walsh's investigation still encompassed his conduct and that he remained a potential defendant. *Shultz*, 8 F.3d at 850. Even though IC Walsh notes that the laws he mentioned contained no criminal sanctions, he had prosecuted others for a conspiracy to defraud the United States by deceitfully concealing violations of the same laws he alleged Reagan violated. Accordingly, we conclude that even after IC Walsh's July 30, 1992, letter, his investigation

continued in a way that would lead Reagan "at the time of incurring the fees to believe that there was a realistic possibility that he would become a defendant." *Dutton*, 11 F.3d at 1079. Therefore, we conclude that Reagan's subject status did not end until the close of the investigation when IC Walsh filed his Final Report.

## B. Fees Incurred "During" the Investigation

■ Reagan seeks fees and costs incurred from September 14, 1990, through January 21, 1994. The court has identified the maximum time for which fees can be sought as spanning from when an IC begins an investigation of an individual through to the deadline for filing comments to the final report. *See, e.g., In re Olson*, 884 F.2d 1415, 1420–22 (D.C.Cir. Spec. Div.1989) (per curiam). Sovereign immunity prevents the award of costs or fees against the United States absent specific statutory authorization, *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1363 (D.C.Cir.1977), and care must be taken to avoid enlarging a statute's waiver of immunity beyond what a fair reading of the statute requires. *In re North (George Fee Application)*, 62 F.3d 1434, 1436 (D.C.Cir. Spec. Div.1994) (per curiam). We must therefore strictly construe the waiver of sovereign immunity found in section 593(f). *See In re Donovan*, 877 F.2d 982, 994 (D.C.Cir. Spec. Div.1989) (per curiam).

■ Section 593(f) allows for the reimbursement of attorneys' fees incurred "during" an independent counsel's investigation. The independent counsel's investigation ends when he or she files a final report "setting forth fully and completely a description of the work of the independent counsel." 28 U.S.C. § 594(h)(1)(B); *Donovan*, 877 F.2d at 994 (noting that an independent counsel's investigation terminates with the filing of a final report). Also, in the instant case, we issued an order and opinion on December 1, 1993, limiting IC Walsh's activities to "noninvestigative and nonprosecutorial tasks," thus making clear that the investigative phase was over. *In re North (Walsh Show Cause Order)*, 10 F.3d 831, 832 (D.C.Cir. Spec. Div. 1993) (per curiam). Even fees for filing com-

ments to the final report are not "strictly speaking . . . incurred 'during [the] investigation' as required by § 593(f)," but we have held "such expenses to be reimbursable since the Act provides that subjects of investigations may file 'comments and factual information [for inclusion in] . . . an appendix to such final report.'" *Donovan*, 877 F.2d at 994.

■ While the Act makes explicit provision for the preparation and filing of comments in 28 U.S.C. § 594(h)(2), which extends the waiver of sovereign immunity to permit the reimbursement of attorneys' fees for such comments, there is no similar provision in the Act authorizing further filings and other activities after a subject has submitted his or her comments to the final report, and we must therefore rely solely on section 593(f) for the waiver. Thus, construing narrowly the waiver of sovereign immunity in section 593(f), we conclude that once IC Walsh filed his Final Report and Reagan submitted his response to it, the investigation and comment period were at an end and any activities occurring thereafter cannot properly be considered as occurring "during" IC Walsh's investigation. The Final Report was filed on August 4, 1993, and the comment period ended on December 3, 1993. We therefore deduct the $84,517.50 in fees and $7,478.40 in expenses claimed for services rendered after December 3, 1993.

## C. The "But For" Requirement

Reagan notes that this court has repeatedly held that attorneys' fees and expenses arising from IC Walsh's investigation would not been incurred "but for" the Act, because they were a result of "the decision of the Independent Counsel to treat as a criminal conspiracy efforts to circumvent the *Boland* Amendments," as "executive branch authorities never treated circumvention of the *Boland* Amendments as having criminal consequences." *Dutton*, 11 F.3d at 1080. Reagan maintains that the extraordinary nature of IC Walsh's investigation, along with its wide scope and long duration, distinguishes this case from other Justice Department investigations and demonstrates that, due to the Act, high-level Executive branch officials were subjected to a far more rigorous appli-

cation of the criminal law than private citizens would have been.

■ The Attorney General agrees that the precedent awarding attorneys' fees in connection with the Iran/Contra matter compels the conclusion that Reagan's fees would not have been incurred "but for" the Act. IC Walsh argues, however, that in assessing the "but for" requirement, the court should determine whether a Department of Justice that was not tainted by a conflict of interest could have carried out the same investigation without questioning Reagan and scrutinizing his conduct. Because any prosecutor charged with investigating the Iran/Contra matter would have interviewed Reagan and investigated the extent of his knowledge of these matters, IC Walsh maintains that Reagan fails the "but for" requirement. We recently rejected this proposed "but for" formulation in *In re North (Regan Fee Application)*, 72 F.3d 891, 895 (D.C.Cir. Spec. Div. 1995) (per curiam), however, and we see no reason to diverge from this precedent.

In assessing the "but for" requirement of the Act, we have previously noted that a politically appointed Attorney General would not have subjected attempts to circumvent the Boland Amendments [2] to criminal prosecution and thus "the [Iran/Contra] investigation would never have occurred, nor the fees have been incurred, 'but for' the appointment of the Independent Counsel under the Act." *Dutton*, 11 F.3d at 1080; *see also In re North (Bush Fee Application)*, 59 F.3d 184, 188 (D.C.Cir. Spec. Div.1995) (per curiam). Accordingly, we conclude that Reagan has met the "but for" requirement.

### D. Reasonableness

■ As we have often observed, the fee petitioner bears the burden of establishing all elements of his entitlement. *See, e.g., Shultz*, 8 F.3d at 852. To demonstrate the reasonableness of his fee petition, Reagan submits time records compiled by his attorneys during his representation, a summary of expenses, affidavits in support of his attorneys' hourly rates, and a survey of hourly

fees for Washington, D.C., law firms. While Reagan has for the most part met the burden of demonstrating the reasonableness of his request, several items require adjustment.

### 1. Attorneys' fees

■ First, Reagan seeks reimbursement for fees incurred in communicating with the media. Most of the media-related fees were incurred after December 3, 1993, and have therefore already been deducted because they were not incurred "during" IC Walsh's investigation. Although our calculations are necessarily rough because billable hours were lumped together on a daily basis rather than being allocated among various tasks, *see Bush*, 59 F.3d at 190, we conclude that Reagan seeks $6,340 in media-related fees incurred before December 3, 1993. We have previously determined that "[m]edia related activity has no bearing on the operation of an independent counsel's investigation and thus is not reasonably related to a defense to such investigation." *Donovan*, 877 F.2d at 994; *see also In re North (Gardner Fee Application)*, 30 F.3d 143, 147 (D.C.Cir. Spec. Div. 1994) (per curiam). Reagan maintains that it was not only proper but imperative for him to respond to IC Walsh's numerous discussions with the media during the course of the investigation. He therefore argues that due to his central role in the controversy and the extraordinary use of the media by IC Walsh, this court's previous denial of reimbursement for media-related fees should not control his application.

Reagan points to *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir.1992), *vacated in part on other grounds*, 984 F.2d 345 (9th Cir.1993), and *Bullfrog Films, Inc. v. Catto*, 815 F.Supp. 338, 344 (C.D.Cal.1993), in which successful plaintiffs received attorneys' fee awards that included fees for media activity. The statutes under which these fees were granted provide that a prevailing party may get reasonable attorneys' fees. *See* 42 U.S.C. § 2000e-5(k) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the

---

**2.** The Boland Amendments were riders to the Department of Defense Appropriation Act, Pub.L. No. 97–377, 96 Stat. 1833, 1865 (1982), which prohibited the government from spending money for the purpose of overthrowing the government of Nicaragua.

prevailing party ... a reasonable attorney's fee"); 28 U.S.C. § 2412(b) ("Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys ... to the prevailing party in any civil action brought by or against the United States"). By contrast, section 593(f) grants a more limited waiver, stating "the division of the court may ... award reimbursement for those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]."

As noted above, the waiver of sovereign immunity found in section 593(f) must be strictly construed, *see Donovan,* 877 F.2d at 994, and we must not enlarge this section's waiver of immunity beyond what a fair reading of it requires. *George,* 62 F.3d at 1436. Thus, hours billed for "activities which were unnecessary to the substantive defense of [the subject] against the charges the Independent Counsel was investigating" are not "contemplated by § 593(f) as fees incurred during the Independent Counsel's investigation." *Donovan,* 877 F.2d at 993. While responding to media reports was certainly a proper and rational defense of Reagan's reputation, as evidenced by the affidavits and the American Bar Association Model Rule he provides, we conclude that such activity is simply not sufficiently related to Reagan's defense of possible criminal charges arising from IC Walsh's investigation so as to satisfy the strict requirements of section 593(f)'s waiver of sovereign immunity. Accordingly, we deduct the $6,340 for media-related fees incurred before December 3, 1993.

■ Second, the billing statements indicate that five of Reagan's attorneys, who billed at rates varying from $205 to $385 per hour, had seven group meetings in July 1992 to discuss strategy and developments. Because of the number of attorneys involved, the fees for these meetings aggregate to well over $1,000 per hour. While it may be reasonable for a client facing serious charges to pay the additional costs of having a highly staffed case, we have previously observed that this does not mean that a petitioner has established the reasonableness of billing such duplication of effort to the public fisc. *Bush,*

59 F.3d at 190. In this instant case, while Reagan has shown that a high level of concentrated effort was necessary, he has not established the reasonableness of billing the public fisc for strategy meetings at over $1,000 per hour. *See Shultz,* 8 F.3d at 852 (noting that certain fees that may not be "unreasonable between a first class law firm and a solvent client, are not [always] supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States."); *see also Bush,* 59 F.3d at 189. We will therefore disallow fees for the lowest-charging attorneys while awarding fees for the two highest-charging attorneys at these group meetings. We conclude that the lowest-charging attorneys incurred $5,501.25 in fees for these seven meetings and deduct that amount.

Last, we turn to the fees incurred in connection with the Final Report. This court has previously held that while fees for reading and responding to the final report are reimbursable, they must not be a disproportionately large share of the overall fee award. *See Gardner,* 30 F.3d at 147 (holding that one-quarter of total fees requested for responding to final report was a disproportionately large share); *Bush,* 59 F.3d at 195 (disproportionate final report fees reduced by approximately one-half). After the various deductions made above, $335,471.25 remains in fees incurred in connection with the Final Report, making such fees approximately fifty percent of the reimbursable fees claimed. Reagan, noting our precedent limiting final report fees to a small percentage of total awards, asserts that, as President, his role in responding to IC Walsh's Report was different in kind than that of any other person named in the Report. He states that the Report sought to hold him responsible for the entire Iran/Contra controversy and accused him and his top aides of engaging in a conspiracy to cover up the affair. Accordingly, Reagan argues that preparing a comprehensive response to the Report was essential to protect not only his personal rights and reputation but also his Administration and his Presidency.

■ We agree that Reagan holds a unique position among subjects responding

to IC Walsh's Final Report because of his role as head of the Administration that IC Walsh was scrutinizing. Although Reagan was clearly justified in submitting extensive comments to the Final Report, it still appears, however, that $335,471.25 in fees for a 122–page response and some related motions is rather high, especially given Reagan's lawyers' obvious familiarity with the relevant facts and issues stemming from their extensive representation of Reagan during IC Walsh's active investigation. Remembering that the touchstone of section 593(f) is reasonableness, we reduce by one-third the fees claimed in connection with the Final Report and therefore deduct $111,823.75. *See Bush,* 59 F.3d at 195; *Shultz,* 8 F.3d at 852.

In sum, we make the following deductions from the attorneys' fees claimed by Reagan:

| | | |
|---|---|---|
| Total fees sought | | $754,449.50 |
| Fees after 12/3/93 | ($84,517.50) | |
| Fees for media activity | ($6,340) | |
| Fees for group meetings | ($5,501.25) | |
| Reduction for Final Report | ($111,823.75) | |
| Total deductions | ($208,182.50) | |
| Total fees awarded | | $546,267 |

### 2. *Expenses*

Reagan also seeks $23,322.48 in expenses incurred in connection with his representation during IC Walsh's investigation. As we noted above, Reagan cannot recover $7,478.40 in expenses connected to services rendered after December 3, 1993, and we therefore deduct this amount. The Attorney General challenges the $427 expense claimed for out-of-town meals, arguing that we have categorically disallowed meal expenses. *See, e.g., In re North (Haskell Fee Application),* 74 F.3d 277, 282 (D.C.Cir. Spec. Div.1996) (per curiam). It is true that we have categorically disallowed the costs of in-town meals, *see id.,* and have disallowed out-of-town meals that lacked sufficient indicia of reasonableness. *Shultz,* 8 F.3d at 853 (disallowing out-of-town meal expense as lacking sufficient explanation to determine reasonableness). We believe that this issue requires clarification, however, because the reasonable cost of out-of-town meals for a necessary trip are reimbursable as travel expenses. *See, e.g., In re North (Gregg Fee Application),* 57 F.3d 1115, 1117 (D.C.Cir. Spec. Div.1995) (per curiam) (allowing recovery of travel expenses and out-of-pocket expenses). Thus, while local meals, *see Dutton,* 11 F.3d at 1081, and local travel to and from home, *see Bush,* 59 F.3d at 195, are not reimbursable as expenses of a legal defense under the Act, necessary out-of-town travel is reimbursable, *see id.,* and the resulting out-of-town meals, if reasonable, are likewise allowable under section 593(f). In this case, Reagan has demonstrated the necessity of two attorneys traveling to meet with him in his home state of California and he has made the further showing that the associated travel costs, including the $427 in meal expenses incurred by the two attorneys over a six to seven day span, are reasonable. Accordingly, we will allow this expense.

We find the remaining expenses reasonable and therefore award $15,844.08 in expenses.

### III. CONCLUSION

Based on the foregoing analysis, we will grant Reagan's petition in part and award $546,267 for attorneys' fees and $15,844.08 for expenses, making a total award of $562,111.08.

*Judgment accordingly.*