Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed October 21, 2003

———

Division No. 94-1

IN RE: MADISON GUARANTY SAVINGS & LOAN
(LINDSEY FEE APPLICATION)

———

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

———

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges*.

# O R D E R

This matter coming to be heard and being heard before the Special Division of the Court upon the application of Bruce R. Lindsey for reimbursement of attorneys' fees and costs pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (2000), and it appearing to the court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the petition is in part well taken, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that the United States reimburse Bruce R. Lindsey for attorneys' fees and

expenses that he incurred during the investigation by Independent Counsel in the amount of $27,992.14.

*PER CURIAM*

For the Court:

Mark J. Langer, Clerk

By:

Marilyn R. Sargent

Chief Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Filed October 21, 2003

Division No. 94-1

IN RE: MADISON GUARANTY SAVINGS & LOAN
(LINDSEY FEE APPLICATION)

————

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

————

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges*.

## ON APPLICATION FOR ATTORNEYS' FEES

Opinion of the Special Court filed *Per Curiam*.

*Per Curiam*: Bruce R. Lindsey, an Arkansas attorney closely associated with the campaigns and administrations of William Jefferson Clinton, petitions under § 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–99 (2000) ("the Act"), for reimbursement of attorney fees in the amount of $245,023.66. He alleges he incurred these fees as a result of an investigation conducted by the Independent Counsel into cash transactions involving Lindsey as the Treasurer of the 1990 Clinton for Governor campaign. We have submitted the application to the Department of Justice ("DOJ") and the Independent Counsel ("IC") for

comment pursuant to § 593(f)(2) of the Act, and thank them for their comments. Although we find that most of the fees sought by Lindsey plainly do not qualify under the Act, we award partial reimbursement for the reasons more fully set forth below.

I. Discussion

A. Factual Background

While much of the factual background concerning the Independent Counsel investigation of former President Clinton and his associates is well known and well publicized, *see, e.g.*, *In re Madison Guar. Savs. and Loan (Clinton Fee Application)*, 334 F.3d 1119, 1119–22 (D.C. Cir., Spec. Div., 2003) (per curiam), we must set forth in some detail the factual background of the present controversy to make it at all understandable. In January 1994, when the Ethics in Government Act had lapsed by its terms and had not yet been re-enacted, then-Attorney General Janet Reno appointed Robert Fiske as a regulatory counsel to take over a criminal investigation previously being conducted by the United States Attorney for the Eastern District of Arkansas and the Criminal Division of the Department of Justice into various allegations against then-President Clinton and various associates of his. The investigation developed information concerning a possible unlawful failure to file required currency transaction reports ("CTRs") for two cash withdrawals from the Perry County Bank ("PCB"). The first withdrawal occurred on May 25, 1990, shortly before the Democratic primary election in which Clinton was seeking renomination as governor of Arkansas, and was in the amount of $30,000. The second occurred on November 2, 1990, shortly before the general election for the same office, and was in the amount of $22,500. In April 1994, regulatory counsel Fiske subpoenaed records from PCB and investigated the suspect transactions further. These efforts uncovered evidence establishing that CTRs covering the two transactions had not been filed on IRS forms 4789, as required by law for currency transactions in excess of $10,000. Because these withdrawals appeared to be clear violations of law, Fiske continued the investigation. The $30,000 transac-

tion was conducted through the use of four checks in the amount of $7,500 each signed by petitioner Bruce R. Lindsey and Gloria Cabe, the authorized signators on the Clinton for Governor campaign account. The $22,500 transaction was evidenced by a receipt in that amount signed by a campaign volunteer for the Clinton campaign, Glenda Cooper. Interviews with Cooper produced evidence that Cabe had asked her to run that errand, and that Lindsey, after the transaction had occurred, expressed his displeasure with the handling of the transaction and told her that if she had any trouble with the IRS she should let him know because he was taking care of the paperwork.

After the re-enacted Ethics in Government Act became effective June 30, 1994, on August 4, 1994, this court appointed Kenneth Starr as statutory Independent Counsel to investigate various allegations of illegal activity concerning then-President Clinton and his associates. Thereafter, Starr's investigative jurisdiction was expanded to include the allegations concerning the Perry County Bank. On February 28, 1995, a federal grand jury indicted Neil T. Ainley, President of the Perry County Bank, on charges relating to the failure to file the CTRs covering the two transactions and of conspiring to commit those violations. Ainley pleaded guilty to two misdemeanor violations of 26 U.S.C. § 7207 and cooperated with the Independent Counsel's investigation.

As part of Ainley's cooperation with the Independent Counsel investigation, and in addition to information he had already provided to Fiske concerning the CTR violations, in May of 1995 he told the Office of Independent Counsel of a scheme involving attorney Herby Branscum Jr., and certified public accountant Robert M. Hill, directors of PCB and controlling shareholders of PCB's parent corporation, to use PCB funds to make contributions to the 1990 Clinton for Governor campaign. On February 20, 1996, the grand jury indicted Branscum and Hill for multiple counts of conspiracy, misapplication of bank funds, falsifying bank records, and false statements. On August 1, 1996, a trial jury acquitted Branscum and Hill of four counts in the indictments and deadlocked on the remaining seven counts. A mistrial was

declared as to the deadlocked counts. The cases were never re-tried. Lindsey was never indicted or otherwise charged with any crimes.

B. Lindsey's Petition

As a result of the investigations into the PCB transactions, Lindsey retained counsel and incurred substantial attorney fees. He now petitions the court for award of $245,023.66 in attorney fees and expenses under 28 U.S.C. § 593(f). His account of the underlying and surrounding facts is consistent with what we have set forth above, but we will hereafter make reference to specific factual items relied upon by him in his petition.

Lindsey admits, and indeed has testified during the course of the investigation, that he, along with others in the Clinton campaign, wished to withdraw $30,000 in cash from the PCB account to fund a "Get Out the Vote" effort. He has further testified, and reiterates in his petition, that he believed that the use of a single check for $30,000 would attract the attention of bank employees in the check processing department in such a fashion as to possibly draw public attention to the withdrawal of the cash. Therefore, for "political" reasons, he used the four separate smaller checks ($7,500 each) to circumvent the requirement that the bank report cash transactions in excess of $10,000. He also admits that the Currency and Foreign Transactions Reporting Act, Pub. L. No. 91–508, 84 Stat. 1122 (1970) ("CFTRA"), requires a financial institution to file a currency transaction report with the IRS for any deposit, withdrawal, or other transaction greater than $10,000, *see* 31 U.S.C. § 5313 (2000); 31 C.F.R. 103.22 (2003). He further acknowledges that the CFTRA prohibits individuals from making "structured transactions" whereby a transaction that would otherwise be subject to the CTR reporting requirements is subdivided into separate transactions of less than $10,000 each to avoid triggering the statutory reporting requirement. He calls the court's attention to his testimony before the investigative grand jury in this matter explaining the political concerns that "animated his decision to use four separate checks" to withdraw the funds for the May 1990

"Get Out the Vote" effort. He further points out that shortly after the primary election, he filed an Arkansas Campaign Finance Report disclosing that the campaign had made the withdrawal of $30,000 for the "Get Out the Vote" expenditures.

Against this background we assess Lindsey's entitlement to the award of attorney fees under the Ethics in Government Act.

## II. Analysis

Unlike persons investigated by Executive Branch prosecutive and law enforcement officers, the subjects of investigations under the Ethics in Government Act are entitled to reimbursement of attorney fees expended in defense against such investigation under limited circumstances delineated in 28 U.S.C. § 593(f)(1), which states:

> Upon the request of an individual who is the subject of an investigation conducted by an independent counsel pursuant to this chapter, the division of the court may, if no indictment is brought against such individual pursuant to that investigation, award reimbursement for those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of this chapter.

In applying this statute, we have held repeatedly that as "a waiver of sovereign immunity it is to be strictly construed." *In re Nofziger*, 925 F.2d 428, 438 (D.C. Cir., Spec. Div., 1991) (per curiam). Therefore, we will award counsel fees only to a petitioner who is unindicted and who demonstrates that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*In re Mullins (Mullins Fee Application)*, 84 F.3d 459, 463 (D.C. Cir., Spec. Div., 1996) (per curiam) (quoting *In re North (Cave Fee Application)*, 57 F.3d 1117, 1119 (D.C. Cir., Spec.

Div., 1995) (per curiam)). As to each of the necessary elements, petitioner bears the burden of proof. *See, e.g.*, *In re North (Reagan Fee Application)*, 94 F.3d 685, 690 (D.C. Cir., Spec. Div., 1996) (per curiam). Applying that analysis to Lindsey's petition, we determine that he has carried his burden with respect to a portion of the fees prayed, but by no means all.

As to the "subject" element, there can be no legitimate question that Lindsey was a subject of the investigation. Although the Act does not define "subject," as we have stated before, "under any definition of 'subject'" this element will be "squarely" met for fees incurred after the Independent Counsel's office informs an individual that he is a "subject." *In re North (Shultz Fee Application)*, 8 F.3d 847, 850 (D.C. Cir., Spec. Div., 1993) (per curiam). It is undisputed that the Independent Counsel's office informed Lindsey that he was first a subject and later a target of its investigation.

As to the "during" element, a portion of Lindsey's fees do not survive this part of the analysis. The Ethics in Government Act applies only to investigations conducted by Independent Counsels appointed under that Act. The statutory Independent Counsel investigating the PCB transactions was not appointed until August 5, 1994. Lindsey prays fees in the amount of $1,357.50 for professional services performed in July 1994. On the face of the petition, these fees fall outside the waiver of sovereign immunity created in § 593(f)(1) and must be disallowed. The balance of the fees sought in the petition, $243,666.16, meets the "during" test.

This brings us to the "but for" element of the analysis. As we have often stated, "the most difficult element for a fee applicant to establish under the Act is that the fees 'would not have been incurred but for the requirements of [the Act].'" *In re Madison Guar. Savs. and Loan (Clinton Fee Application)*, 334 F.3d at 1123 (citing cases) (internal quotation marks omitted). While this difficulty is because in part of the burden upon the petitioner "to prove a negative and one with a high component of speculation," *id.*, it is also "difficult because the law contemplates that it should be difficult; that

the fees will not be a common thing." *Id.*; *see also, e.g.*, *In re Olson*, 884 F.2d 1415, 1420 (D.C. Cir., Spec. Div., 1989) ("The court is admonished to award reimbursement for attorneys' fees 'in only rare instances' for 'extraordinary expenses,' 'sparingly.' ") (quoting S. Rep. 97–496, 92nd Cong., 2d Sess. 19 (1982)). Otherwise put, "the contemplation of the legislation is not that subjects of independent counsel investigations will be reimbursed for all legal fees, but only that they will be reimbursed for those legal fees that would not have been incurred by a similarly-situated subject investigated in the absence of the Act." *In re Pierce*, 213 F.3d 713, 717 (D.C. Cir., Spec. Div., 2000) (per curiam).

Perhaps in recognition of the difficulty of his task, Lindsey offers a sweeping multifaceted argument supporting that he would not have incurred the fees he seeks "but for" the requirements of the Ethics in Government Act. So sweeping is his claim that he first asserts that the investigation of his apparent violations of the CFTRA would not have occurred at all but for the Act. This assertion is patently untenable. The investigation not only would have commenced in the absence of the Act, it did. The investigation began before Congress reauthorized the Act.

However, this does not end our analysis. We are left with the question "whether *the requirements of the Act* caused an increase in the length or intensity of the investigation." *In re Madison Guar. Savs. and Loan (Jordan Fee Application)*, ___ F.3d ___, 2003 WL 22231590, at *4 (D.C. Cir., Spec. Div., 2003) (per curiam) (citing *In re North (Dutton Fee Application)*, 11 F.3d 1075 (D.C. Cir., Spec. Div., 1996) (per curiam), and *In re Donovan (Donovan Fee Application)*, 877 F.2d 982, 990 (D.C. Cir., Spec. Div., 1989) (per curiam)). To put it differently, it is our task to determine whether Lindsey has established that all or part of the investigation conducted after the appointment of the statutory Independent Counsel would not have occurred in the absence of the Act. It is obvious that some of the further investigation would have occurred. The Independent Counsel inherited an ongoing investigation. It would have been impossible for him to have stopped that investigation without at least reviewing it imme-

diately upon replacing regulatory counsel Fiske. To determine whether some of his investigation would not have occurred but for the requirements of the Act, we will apply the four helpful tests we have employed in numerous fee application evaluations:

> 1. [Whether] the independent counsel's investigation substantially constituted duplication of the preliminary investigation conducted by the Department of Justice. *In re Olson*, 884 F.2d 1415, 1420 (D.C. Cir., Spec. Div., 1989) (per curiam); *In re North (Dutton Fee Application)*, 11 F.3d at 1080.
>
> 2. [Whether] the petitioning subject has been "prejudiced by the Department of Justice's failure to comply with the substantial protective features of the Act." *In re Nofziger*, 925 F.2d at 438 (citing *In re Meese*, 907 F.2d 1192 (D.C. Cir., Spec. Div., 1990) (per curiam)).
>
> 3. [Whether] in the absence of the requirements of the Act "the case could have been disposed of at an early stage of the investigation," without subjecting the petitioning subject to the conditions that led to his incurring the fees sought. *In re Segal (Sagawa Fee Application)*, 151 F.3d 1085, 1089 (D.C. Cir., Spec. Div., 1998) (per curiam) (quoting *In re Nofziger*, 925 F.2d at 438).
>
> 4. Not wholly distinct from No. 3, *supra*, [whether] "high public officials [or derivative subjects] were investigated under the Act in circumstances where private citizens would not [have been] investigated." *In re Nofziger*, 925 F.2d at 442; *In re North (Dutton Fee Application)*, 11 F.3d at 1080.[1]

*In re Pierce (Abrams Fee Application)*, 190 F.3d 586, 592 (D.C. Cir., Spec. Div., 1999) (citations omitted).

---

[1] We have often referred to these four categories as not necessarily exhaustive of the universe of possible "circumstances sufficient to qualify for [an] attorney fee award in the face of the 'but for' requirement." *In re Madison Guar. Savs. and Loan (Jordan Fee Application)*, ___ F.3d ___, 2003 WL 22231590, at *3. However, here, as in earlier cases, *e.g., id.*, petitioner has advanced no novel circumstance warranting an award that falls outside the four established categories.

Before making a general application of those four categories, we note that a discrete part of the remaining $243,666.16 can be analyzed on a more specific basis. Lindsey claims $1840.00 for time spent on July 17 and 18 for 2.25 hours of legal services concerning review of the Independent Counsel's report, required by 28 U.S.C. § 594(h)(1)(B), and 1.25 hours for editing notes relating to the fee application. The time spent on the report is reimbursable; the time spent on the fee application is not. We have repeatedly held that the unique reporting requirement of the Act automatically qualifies fees generated by the report for reimbursement. *See, e.g.*, *In re Madison Guar. Savs. and Loan (Clinton Fee Application)*, 334 F.3d at 1128. We have likewise held that the statute does not award "fees for fees" so that the 1.25 hours is automatically disallowed. *See In re Mullins (Mullins Fee Application)*, 84 F.3d 459, 466 (D.C. Cir., Spec. Div., 1996) (per curiam); *In re North (Gadd Fee Application)*, 12 F.3d 252, 257 (D.C. Cir., Spec. Div., 1994) (per curiam). Thus, we easily ascertain that $575 of the prayed fees will be disallowed; $1,035 will be awarded. We will then subject the remaining $243,091.16 to analysis under the four listed categories.

The gravamen of Lindsey's argument is that this investigation falls within category 4. That is, he claims that the apparently unlawful structuring of the withdrawals to avoid the reporting requirements of the CFTRA would not have been subjected to this intense investigation had the transactions involved private citizens not subject to investigation by an independent counsel appointed under the Ethics in Government Act. While we have already noted that this argument cannot support an award of the full fees incurred, as the investigation not only would have been but also was commenced in the absence of the Act, this does not dispose of the possibility that the intensity and length of the investigation was enhanced by the requirements of the Act. In support of his proposition that this is the case, Lindsey advances a rather complex argument. First, he asserts that the withdrawals which occurred here do not fall within the purpose of the CFTRA. He advances legislative history for the no doubt

accurate proposition that in enacting 31 U.S.C. § 5324, "Congress was not concerned with individuals conducting garden-variety banking transactions but was instead principally targeting entities engaged in money laundering and tax evasion." Petition of Lindsey at 22, citing S. Rep. No. 99–433 (1986); H. Rep. No. 99–746 (1986). As he notes, the House Judiciary Committee observed: "Money laundering is the lifeblood of the drug traffickers and traditional organized crime." H. Rep. No. 99–746, at 16. While we are not certain that the deliberate structuring of a transaction in such a fashion as to avoid the reporting requirements of federal law can ever be properly styled "garden variety," Lindsey's proposition may be otherwise true. Nonetheless, it is not dispositive.

The reach of a statute may be, and often is, far greater than the specific motivation of its authors. Indeed, he admits as much when he incorporates the adjective "principally" in describing the targeting of the CFTRA toward money laundering and tax evasion. To establish further the truth of the proposition that a statute's reach often exceeds its motivation, we need but look to the sweeping effect of the Racketeer–Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. It is fair to say that "[i]n enacting RICO, Congress was trying to get the Mafia out of legitimate business." D. Sentelle, *Civil RICO: The Judges' Perspective*, 12 Campbell L. Rev. 145, 149 (1990) (citing G. Lynch, *RICO: The Crime of Being a Criminal*, 87 Colum. L. Rev. 920 (1987)). But as the Supreme Court observed in 1985, "private civil actions under the statute are being brought almost solely against [legitimate] defendants rather than against the archetypical intimidating mobster." *Sedima v. Imrex*, 473 U.S. 479, 499 (1985). The Supreme Court has made it explicit that the breadth of the application of the language enacted by Congress beyond the remedying of the evil which motivated it "is hardly a sufficient reason for assuming that the provision is being misconstrued." *Id.* Just so here. Money laundering may have been the motivation for the enactment, but that does not define the scope of its application.

The evidence presented to the statutory independent counsel upon inheriting the investigation from the regulatory

counsel on its face revealed conduct falling squarely within the elements of the conduct outlawed by Congress, even if its context was not what Congress had in mind. Again, however, this does not foreclose all possibility of some validity in Lindsey's argument. There is a large universe of cases in which the subject of the investigation may have engaged in conduct that literally violated all the elements of a criminal statute but in which, for reasons of policy, " 'the Department of Justice would in all likelihood exercise its discretion to decline to prosecute . . . as a criminal matter.' " *In re Segal*, 145 F.3d 148, 152 (D.C. Cir., Spec. Div., 1998) (per curiam) (quoting Application for Appointment of Independent Counsel). Lindsey's arguments require us to examine the facts before us further to determine if this is one such case.

Lindsey asserts that in an exhaustive review of 178 opinions (the apparent full universe of published opinions arising from criminal prosecutions for structured currency transactions), counsel for Lindsey "found *not a single case* where, as here: (1) the source of the funds was legally derived and there was no intent to evade taxes; (2) the defendant was accused of structured *withdrawals*, not deposits; and (3) the substance of the transactions in question was actually disclosed in an alternative *public* report." (Emphasis petitioner's.) While this is interesting, it is not particularly surprising. Presumably, many prosecuted cases analyzed on a sufficient level of specificity appear unique. That is, each case arises from its own history, and the fact that no previous prosecution has precisely coincided with each fact in a case under examination hardly renders the unique case unworthy of prosecution. To hold otherwise would be to reward ingenuity in the methodology of criminal violation. This does not bring Lindsey's application within the ambit of the precedent we established in such cases as *In re North (Dutton Fee Application)*, 11 F.3d 1075 (D.C. Cir., Spec. Div., 1993) (per curiam), wherein we held that the conduct investigated by the Independent Counsel would not have been "treated . . . as having criminal consequences" at all, *id.* at 1080 (explaining that criminal investigation of circumvention of the "Boland Amendment" would not have occurred in the absence of the

requirements of the Act). *See also In re North*, 72 F.3d 891, 895 (D.C. Cir., Spec. Div., 1995) (per curiam). Still, while of little independent force, insofar as the lack of a square precedent weighs at all, it weighs in favor of the proposition that a professional or politically appointed prosecutor would not have brought a prosecution on the facts of Lindsey's case.

In further support of the proposition that his petition is governed by the logic of *In re Segal*, Lindsey points out that of the 178 reported cases, 151 contain direct evidence that the currency in question was derived from illicit sources or was being concealed to evade federal taxation, and that in at least 12 of the remaining 27 decisions, circumstantial evidence suggested the presence of other illicit activities. Finally, 8 of the remaining 15 cases involved prosecutions of "insiders" within the institution, comparable to Branscum, Hill, and Ainley, who had duties under the reporting provisions of the CFTRA, unlike Lindsey, whose only exposure came from the structured transaction. Again, this cannot bring the case within the precedent of *Dutton*, as it only demonstrates that *few*, as opposed to *none*, of the investigations and prosecutions by professional or politically appointed prosecutors had involved defendants or conduct similar to Lindsey and his transactions. Further, the apparent statistical analysis has the inherent and perhaps unavoidable flaw that we do not know from what universe of potential prosecutions the actual prosecutions arose. That is, it may be that the greater number of prosecutions of insiders dealing with deposits as opposed to outsiders making withdrawals results from there being more such violations in the first instance. We simply cannot know.[2] Again, this argument weighs little. Again however, insofar as it weighs anything, it weighs in Lindsey's favor.

Finally, and with some convincing force, Lindsey asserts that none of the reported cases involve prosecution of an individual accused of making a structured transaction which

---

[2] Also, most federal criminal cases end in pleas and never become reported cases. Lindsey's analysis provides neither information nor allowance on those cases.

he actually reported in some other public document shortly after the commission of the acts constituting the apparent offense. Lindsey did in fact disclose the $30,000 withdrawal as a single transaction on an Arkansas campaign finance report shortly after the primary. This fact certainly goes to the apparent presence or lack of criminal intent on the part of the actor and may well have caused a United States Attorney who, unlike the Independent Counsel, would have been confronted with choices for prosecution of a great many cases and would have been much more limited in the availability of investigative and prosecutorial resources to devote to the case to make a determination to decline prosecution. The wisdom of such a choice may be reflected in the fact that the two insiders who went to trial were never convicted. Again, this factor weighs in Lindsey's favor and somewhat more heavily than the others.

The remaining difficulty to Lindsey is that accepting all of his propositions as true, they still do not erase the fact that the Independent Counsel could have known of none of them without conducting an investigation. That is, Lindsey has succeeded in convincing us that a politically appointed or professional prosecutor having conducted an investigation and found out all that Lindsey has told us would then not have proceeded to indicting Lindsey. Since that is precisely what occurred under the application of the Ethics in Government Act, taking all of Lindsey's points in his favor, we still must conclude that the investigation would have occurred even in the absence of the Act, and he would still have incurred legal fees. Thus, it is impossible for us to conclude that all of his counsel fees survive the "but for" test.

Lindsey's remaining hope is that those factors convince us that the investigation would not have been as extensive or as lengthy before the decision to decline prosecution was made, and that therefore, some portion of his fees would not have been incurred but for the requirements of the Act. We agree that this is likely. While this is not a case like *Segal*, where the professional or politically appointed prosecutor would have declined on the face of the first facts uncovered, nonetheless, the factors set forth by Lindsey convince us that the

decision not to prosecute was a likely one and one that would likely have been made at an earlier stage but for the Act. That is, the Independent Counsel, unlike other prosecutors, was required by the provisions of 28 U.S.C. § 594(h)(1)(D) to file a final report "setting forth fully and completely a description of the work of the Independent Counsel, including the disposition of all cases brought." While the applicable version of the reporting requirement no longer contains the mandate of an earlier version, which had required that the report include "the reasons for not prosecuting any matter within the prosecutorial jurisdiction of such independent counsel," the import of the report is still in the direction of enhanced thoroughness in exercising such prosecutorial discretion. Likewise, as we implied above, the Independent Counsel's single case jurisdiction and expanded resources, as opposed to those of a United States Attorney, would likely further impel an enhanced thoroughness of investigation before the exercise of a determination not to prosecute an apparent violation of federal law falling within the Independent Counsel's jurisdiction. We therefore are convinced that some portion of Lindsey's counsel fees would not have been incurred "but for" the requirements of the Act.

The remaining difficulty is that Lindsey, in an understandable zeal to obtain reimbursement for *all* of his counsel fees, has given us little help in determining what part actually comes within the allowable realm. Likewise, the IC and the DOJ, in their evaluations of Lindsey's petition, have understandably focused on disposing of his claims to full reimbursement. Each of them, substantially for the reasons set forth above, concludes that the claims for full reimbursement are meritless. This does not, however, provide us much assistance in ascertaining at what point the fees become reimbursable once we have rejected the all-or-nothing approach. Therefore, we have independently examined the record in the case to fix the point in time at which Lindsey no longer would have been considered a subject had the Act not been in effect. Arguably, we should reject the full petition, as the petitioner bears the burden of establishing his entitlement. *See, e.g., In re North (Reagan Fee Application)*, 94 F.3d at 690. Howev-

er, we are convinced that taking all Lindsey's arguments together and examining the record in light of those arguments, we can determine a point at which we can reasonably conclude Lindsey's status as subject would have terminated but for the Act. Taking all those factors into account, we believe that in the absence of the Act, Lindsey's status as a subject would have terminated at or around the time of the indictment of the last two insiders from the bank, that is, around February 20, 1996.

After that critical date in February, during the balance of that month, Lindsey incurred fees in the amount of $1,345. He claims expenses for February in the amount of $181.19. While we are unable to ascertain precisely the date he incurred those expenses, on a pro rata basis we find it reasonable to hold that $45.30 of the expenses billed for February survive the "but for" analysis. Adding the counsel fees for this part of February and for the months of March, April, May, June, July, August, and September produces a total of $26,097.50 in counsel fees which survive the "but for" test. Expenses for the same period, inclusive of the pro rata share for February, total $1,894.64.

Before settling on the above amounts as reimbursable, we must also subject the billing to the reasonableness analysis mandated by the statute. Assisted by the comments by the Department of Justice and the Independent Counsel, we have first subjected the fees to an analysis as to the reasonableness of the hourly rates of the attorneys performing services for Mr. Lindsey, which were generally in the range of $295–350 per hour. Given the importance of the matter to a petitioner of Mr. Lindsey's status, and the level of professional expertise and reputation of the attorneys whom he employed, we find the rates, while perhaps high in some abstract sense, fall within the bounds of reasonableness established in our prior decisions. *Cf. In re North (Bush Fee Application)*, 59 F.3d 184, 189 (D.C. Cir., Spec. Div., 1995) (per curiam). The Independent Counsel also calls our attention to the fact that the billing often represents two attorneys jointly performing task and suggests that we might question the reasonableness of those fees under our precedent in *In re North*

*(Bush Fee Application)*, *id.* at 190 ("though it may be reasonable for a solvent client charged with a serious offense to pay the additional costs of having a highly staffed case, this does not mean that petitioner has established the reasonableness of billing that sort of duplication (or in this case triplication or more) to the public fisc.") (citation omitted). We have examined the staffing level of the present billing in detail and conclude that the petition seeks fees only for reasonable levels of staffing. There are times that call for two attorneys. All the times in which two attorneys were employed in this case seemed to fall within that category. Therefore, we find all of the fees that survive the "but for" analysis also survive the reasonableness test. As to the expenses, while we are not able to determine with the precision we would prefer the necessity of each of the expenses claimed, we hold that they do not fall outside the bounds of reasonableness. We therefore will allow all those expenses totalled above.

III.   Clarification

Knowing that our decision herein may be cited as precedent in future cases involving petitions for attorney fees under the Act, we wish to clarify what we are not holding. It is not our holding that the reporting requirement and the single-case focus of the Independent Counsel are sufficient to warrant the award of attorney fees in the face of the "but for" test. As we noted in *Clinton Fee Application*, because the same statutory requirements "occur in every Independent Counsel investigation," and because Congress has made it plain that the award of fees should not so occur, these provisions "cannot be bases for satisfying the 'but for' requirement." *Clinton Fee Application*, 334 F.3d at 1124–25. We hold only that in a case such as this wherein the prosecutor must make a decision to decline prosecution on facts that would on their face support a finding of criminal conduct, we will consider those factors in determining whether the prosecutor would have made that decision at an earlier point in the investigation or after a less intense investigation in the absence of the requirements of the Act. We intend to create no more precedent on that subject than that which we have just stated.

## Conclusion

For the reasons set forth above and by judgment of even date herewith, we award to petitioner Bruce Lindsey reimbursement for counsel fees in the total amount of $26,097.50, and expenses in the amount of $1,894.64, for a total judgment of $27,992.14.