# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed July 21, 2006

Division No. 95-1

IN RE: CISNEROS
(FINKELSTEIN FEE APPLICATION)

———

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

———

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges*.

## O R D E R

This matter coming to be heard and being heard before the Special Division of the Court upon the petition of Barry J. Finkelstein for reimbursement of attorneys' fees and costs pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (2000), and it appearing to the court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the petition is for the most part well taken, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that Barry Finkelstein shall be reimbursed for attorneys' fees and expenses in the amount of $110,013.09.

*PER CURIAM*
For the Court:
Mark J. Langer, Clerk
By:
Marilyn R. Sargent
Chief Deputy Clerk

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed July __, 2006

Division No. 95-1

IN RE: CISNEROS
(FINKELSTEIN FEE APPLICATION)

———

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

———

Before:   SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges*.

## ON APPLICATION FOR ATTORNEYS' FEES

*PER CURIAM*: Barry J. Finkelstein petitions this Court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591-599 (2000) (the Act), for reimbursement of attorneys' fees in the amount of $110,763.09 that he claims were incurred during and as a result of the investigation conducted by the Independent Counsel (IC). Because we find that Finkelstein has established his entitlement under the statutory criteria for reimbursement of a portion of the fees we will, for the reasons set forth more fully below, allow recovery of $110,013.09.

4

**Background**

In 1994 allegations arose that Henry Cisneros, then-Secretary of Housing and Urban Development, during his appointment process may have made false statements to the FBI concerning alleged payments made by him to his mistress. After conducting a preliminary investigation pursuant to the Independent Counsel statute, the Attorney General requested that this court appoint an independent counsel to further investigate the matter, and the appointment was made on May 24, 1995. Approximately one and a half years after his appointment, the Independent Counsel requested that his jurisdiction be expanded to include investigation of possible tax violations by Cisneros in years 1989, 1991, 1992, and 1993. This request was granted only for the year 1992.

During his subsequent investigation, the IC apparently came into possession of an internal IRS memorandum that contained allegations of impropriety by the IRS Washington, D.C., office in its decision not to recommend prosecution of Cisneros for tax violations. The memorandum alleged "possible improprieties by Assistant Chief Counsel (Criminal Tax)." The IC, beginning in 1997, then undertook his own investigation into whether obstruction of justice occurred in the decisions of certain IRS (and DOJ) officials in not authorizing the investigation or prosecution of Cisneros for possible tax violations (hereinafter "the obstruction investigation"). Barry Finkelstein, the fee applicant here, was investigated by the IC in his capacity as the head of the Assistant Chief Counsel's Office for Criminal Tax.

In 1998 the obstruction investigation was temporarily suspended, until 2000. Upon resumption, on May 18, 2000, the Office of the Independent Counsel (OIC) informed Finkelstein's attorney that Finkelstein was a "subject" of the grand jury's investigation. Apparently on the following day, May 19,

Finkelstein was granted use immunity under 19 U.S.C. §§ 6002-6003. In the following seven months he would be called before the grand jury 29 times. He was never indicted and now, pursuant to the Act, seeks reimbursement for his attorneys' fees generated between May 22, 2000, and May 31, 2005, in the amount of $110,763.09. As directed by section 593(f)(2) of the Act, we forwarded copies of Finkelstein's fee petition to the Attorney General and the IC and requested written evaluations of the petition. The court expresses its appreciation to the IC and the Attorney General for submitting these evaluations, which we have given due consideration in arriving at the decision announced herein.

**Discussion**

The Ethics in Government Act provides for reimbursement of attorneys' fees expended in defense against an investigation under the Act by subjects who qualify under 28 U.S.C. § 593(f)(1). That section provides:

> Upon the request of an individual who is the subject of an investigation conducted by an independent counsel pursuant to this chapter, the division of the court may, if no indictment is brought against such individual pursuant to that investigation, award reimbursement for those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of this chapter.

Because the Act "constitutes a waiver of sovereign immunity it is to be strictly construed." *In re Nofziger*, 925 F.2d 428, 438 (D.C. Cir., Spec. Div., 1991) (per curiam). Under the Act, therefore, we can only order reimbursement for attorneys' fees when we determine, *inter alia*, that the fee petitioner was a "subject" of the independent counsel's investigation and would

not have incurred the attorneys' fees "but for" the requirements of the Act. *See, e.g., In re Pierce (Kisner Fee Application)*, 178 F.3d 1356, 1358 (D.C. Cir., Spec. Div., 1999) (per curiam). The petitioner "bears the burden of establishing all elements of his entitlement." *In re North (Reagan Fee Application)*, 94 F.3d 685, 690 (D.C. Cir., Spec. Div., 1996) (per curiam). There is apparently no dispute that Finkelstein incurred his attorneys' fees "during" the IC's investigation. The remainder of the discussion will therefore address the "subject," "but for," and "reasonable" requirements.

*A. "Subject" Status*

We have previously defined the term "subject" as a person whose conduct is within the scope of the independent counsel's investigation such that "the Independent Counsel might reasonably be expected to point the finger of accusation" at him. *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1078 (D.C. Cir., Spec. Div., 1993) (per curiam); *see also In re North (Shultz Fee Application)*, 8 F.3d 847, 850 (D.C. Cir., Spec. Div., 1993) (per curiam). Additionally, in *Shultz* we held that, under any definition of the term, the criterion for "subject" status is squarely met when the Independent Counsel tells a person that he is in fact a subject. 8 F.3d at 850. Finkelstein notes that on May 18, 2000, the OIC indicated that he was a subject of the investigation. Citing *Shultz*, 8 F.3d 847, Finkelstein argues that subject status is "squarely" met when an independent counsel's office tells a person that he is a subject.

Finkelstein goes on to argue that although he was granted use immunity the next day, that grant did not "alter [his] status." He first cites *Dutton*, 11 F.3d at 1078-79, for the proposition that a subject granted use immunity "does not automatically lose" his subject status upon the immunity grant. He then cites two additional fee application cases in the North investigation in

which the court determined that a grant of immunity did not change the fee applicant's subject status. In *In re North (Cave Fee Application)*, 57 F.3d 1117, 1120 (D.C. Cir., Spec. Div., 1995) (per curiam), according to Finkelstein, the fee applicant "remained a subject after the grant of immunity 'because the information he provided to the grand jury could have been derived from two to four other witnesses,' providing the government an independent source for the testimony if it chose to pursue charges against [the applicant]." And in *In re North (Haskell Fee Application)*, 74 F.3d 277, 282 (D.C. Cir., Spec. Div., 1996) (per curiam), Finkelstein notes that although the fee applicant was granted use immunity, he was thereafter interviewed twice, with the court concluding that he was still under threat of prosecution until the Independent Counsel determined that the information he provided was truthful.

Analogizing his case to *Cave*, Finkelstein claims that "the testimony [he] provided could have been – and indeed likely was – obtained from other witnesses," i.e., obtained from two of his colleagues at the IRS who provided testimony concerning the same events and circumstances as he did. As such, according to Finkelstein, the OIC had a wholly independent source of information if it chose to pursue charges against him. And in analogizing his case to *Haskell*, Finkelstein notes that he was called before the grand jury 29 times, where "[h]e was routinely and rigorously questioned about his contemporaneous communications with others involved in the Independent Counsel's inquiry and asked whether he was discussing his grand jury testimony with those individuals." Because of the numerous requests for his grand jury appearances and the nature of the questioning during those appearances, Finkelstein argues that although he was granted use immunity, there was still a realistic possibility that he would become a defendant.

In its evaluation of Finkelstein's application, the OIC responds in two short paragraphs to Finkelstein's claim to post-immunity subject status.  Although the OIC does not outright dispute Finkelstein's claim, it does note that a person still considered a subject after receiving use immunity is "not the norm," *In re Pierce (Abrams Fee Application)*, 190 F.3d 586, 591 (D.C. Cir., Spec. Div., 1999) (per curiam), that a grant of use immunity changes the "reasonable perception" as to whether the immunized witness can apprehend becoming a defendant, *id.*, and that "[t]herefore, Finkelstein could reasonably have perceived himself to be a subject of the investigation after receiving his grant of immunity from the OIC only in unusual circumstances."  Tellingly, the OIC ends its discussion there, without any assertion that "unusual circumstances" are absent in Finkelstein's case.

In its evaluation, the Department of Justice, after first noting that Finkelstein was informed by the OIC that his status was that of subject and at some point thereafter granted use immunity, states that it "do[es] not have sufficient information to determine definitively whether Mr. Finkelstein remained a subject."  Nevertheless, the DOJ goes on to note certain factors cited by Finkelstein which could support his claim to post-immunity subject status.  First, the DOJ asserts that Finkelstein is apparently correct in claiming that relevant incriminating information against him could have been obtained from Finkelstein's two testifying IRS colleagues.  The DOJ notes in this regard that "[t]he Final Report addresses in detail the activities of the office Mr. Finkelstein headed with reference to the testimony of these three individuals as well as others at IRS."

Second, the DOJ notes that "the genesis for the Independent Counsel's investigation regarding IRS" was the memorandum entitled "Possible Improprieties by Assistant Chief Counsel

(Criminal Tax)," which was the office headed by Finkelstein. As such, argues the DOJ, Finkelstein's situation falls within the ambit of *Cave*, in that

> Finkelstein's status as head of the office that was at the center of the allegations of impropriety might have led a "reasonably counseled person at the time of incurring the fees" to believe that he remained a subject of the investigation even after receiving use immunity. *Cave*, 57 F.3d at 1120.

As noted by the OIC, it "is not the norm" for a fee applicant, after receiving a grant of use immunity, to "nonetheless believe that there remains a realistic possibility that he would become a defendant." *Abrams*, 190 F.3d at 591 (quotation marks and brackets omitted). This court has noted that in order to move out of the norm, "extraordinary facts" must be present. *Id*. (analyzing *Cave*, 57 F.3d at 1117). Such extraordinary facts are present here. First, as Finkelstein points out, two of his colleagues were brought before the grand jury to be questioned on the same topics as him. Therefore, paraphrasing *Cave*, the grant of use immunity did not protect Finkelstein from the realistic possibility that he would become a defendant because the information he provided to the grand jury could have been derived from two other witnesses, thus providing the OIC with a wholly independent source for the testimony if it chose to pursue charges against him. 57 F.3d at 1120.

Second, within a seven-month time span, Finkelstein was called before the grand jury an "extraordinary" 29 times, where he was questioned "rigorously" about any conversations he may have had with others about his grand jury testimony. This alone may be sufficient to bring him out of the norm. But also, as pointed out by the DOJ, the obstruction investigation was

initiated when the OIC came into possession of the so-called "improprieties memo," which primarily concerned alleged misconduct on the part of Finkelstein. "Extraordinary facts" therefore led Finkelstein to believe that notwithstanding the grant of use immunity he nevertheless reasonably believed that there remained a realistic possibility that he could become a defendant.

   *B.   Fees Not Incurred "But For" the Requirements of the Act*

   The Act requires that to be reimbursable, attorneys' fees must "not have been incurred *but for* the requirements of [the Act]." 28 U.S.C. § 593(f)(1) (emphasis added). Accordingly, "[a]ll requests for attorneys' fees under the Act must satisfy the 'but for' requirement of" the Act. *In re Sealed Case*, 890 F.2d 451, 452 (D.C. Cir., Spec. Div., 1989) (per curiam). The purpose of limiting fee awards to fees that would not have been incurred "but for" the Act is to ensure that "officials [and here derivative 'subjects'] who are investigated by independent counsels will be subject only to paying those attorneys' fees that would normally be paid by private citizens being investigated for the same offense by" federal executive officials such as the United States Attorney. *Id.* (citing S. REP. NO. 97-496, 97th Cong., 2d Sess. 18 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3537, 3554 (referring to "fees [that] would not have been incurred in the absence of the [Act]")).

   Finkelstein begins his argument for passing the "but for" test by quoting from *In re Meese*, 907 F.2d 1192, 1201 (D.C. Cir., Spec. Div., 1990) (per curiam), to the effect that during the IC's investigation he was subjected to a "more rigorous application of the criminal law than is applied to other citizens." He notes that in *Meese* the independent counsel's initial investigation concerned only "a single, narrow question," but

that later his jurisdiction was expanded to include an additional six matters, and that because of this "extreme expansion" of the investigation the court found Meese to have fulfilled the "but for" requirement. In his case too, argues Finkelstein, "the investigation was expanded exponentially by the Independent Counsel," who "pursued a portion of the investigation that a normal prosecutor – restrained by the consideration of finite resources and competing law enforcement priorities – would never have had the time, resources, or discretion to pursue." Citing to a number of previous Special Division fee application decisions, *e.g.*, *In re Espy (Townsend Fee Application)*, 346 F.3d 199 (D.C. Cir., Spec. Div., 2003) (per curiam); *In re Espy (Kearney Fee Application)*, 319 F.3d 526 (D.C. Cir., Spec. Div., 2003) (per curiam), Finkelstein goes on to argue that even if an "ordinary prosecutor" would have undertaken the obstruction investigation, "it can hardly be doubted that the investigation undertaken by the Independent Counsel was significantly longer, more far-reaching, and more rigorous than any such investigation by an ordinary prosecutor would have been."

The OIC in its evaluation disputes Finkelstein's claim that he fulfills the "but for" requirement. First, the OIC asserts that this court has "identif[ied] four situations in which applicants are entitled to awards because the special limitations and procedures of the Act imposed legal expenses on the subject," *see, e.g., In re Pierce (Seligman Fee Application)*, 201 F.3d 473, 475 (D.C. Cir., Spec. Div., 2000) (per curiam), and that Finkelstein has not brought himself within any of these categories. Instead, argues the OIC, he has relied on *Meese*, which "presents numerous unique facts not present here." The OIC distinguishes this case from *Meese* by asserting that in that case the investigation was not based on any evidence of wrongdoing, but rather "was a generalized effort to place [Meese] under scrutiny." But here, according to the OIC, the investigation was based on the "improprieties memorandum,"

which "directly accused Finkelstein of wrongdoing." In sum, states the OIC, "whereas Meese was scrutinized when there was *no* evidence of wrongdoing, Finkelstein was scrutinized because there *was* evidence of his wrongdoing." (emphases in original).

Finally, the OIC notes that there were "serious allegations against [Finkelstein] contained in the Improprieties Memorandum" and that the Memorandum led the Treasury Inspector General's office to initiate an investigation. The OIC further claims that two U.S. Senators had requested that "allegations of Justice Department interference with IRS investigations of Clinton Administration officials and Democratic Party figures" be looked into. Consequently, argues the OIC, "[h]ad there not been an independent counsel investigation, Finkelstein would still have faced some form of intense scrutiny," thus incurring attorneys' fees.

The DOJ in its evaluation agrees with Finkelstein that he has satisfied the "but for" requirement. First, the Department notes that although "it is appropriate" for it to take over any remaining investigations of a closing independent counsel office, no such action occurred here. According to the DOJ, this case is thus analogous to *In re Segal (Segal Fee Application)*, 145 F.3d 1348, 1352 (D.C. Cir., Spec. Div., 1998) (per curiam), and *In re Olson (Perry Fee Application)*, 892 F.2d 1073, 1074 (D.C. Cir., Spec. Div., 1990) (per curiam), in that here, as there, "this Court . . . found the 'but for' test satisfied based on a lack of prosecutorial interest."

Second, in the DOJ's opinion the allegations investigated by the IC "appear much more akin to bureaucratic conflict than suggestive of criminal behavior." In support of this statement, the DOJ asserts that the central issue investigated by the Independent Counsel was a dispute between the IRS's regional office and Washington office over whether there was sufficient

evidence to criminally prosecute Cisneros for tax violations. Dissecting the so-called "improprieties memorandum," the DOJ argues that "the complaints in the memorandum were in the nature of bureaucratic conflict," and further that

> [t]hese sorts of allegations . . . would not in the normal course, without additional evidence, generate a criminal investigation of government employees carrying out their respective duties in evaluating the matters in question.

Third, the DOJ points out that the IC, after investigating Cisneros for tax year 1992, ultimately decided not to indict because wilfulness could not be established – the same reason that led the IRS to decline referral in the first place. And the DOJ also notes that it too declined to refer other tax years to the IC, leading to the conclusion that in the end the IC, the DOJ, and the IRS Washington office were all in agreement that prosecution of the tax matters was not warranted. Under such circumstances, asserts the DOJ, "the conflict would not have been the topic of a criminal investigation 'but for' the existence of the Independent Counsel statute."

As the DOJ suggests, the matter looked into in the IC's "obstruction investigation" appears to have been nothing more than a "bureaucratic conflict." In several fee applications considered at the end of the Iran/Contra independent counsel investigation, this court noted that during that investigation the Independent Counsel treated efforts to circumvent the Boland Amendments as a criminal conspiracy. *See, e.g., In re North (Dutton Fee Application)*, 11 F.3d 1075, 1080 (D.C. Cir., Spec. Div., 1993); *In re North (Gardner Fee Application)*, 30 F.3d 143, 146 (D.C. Cir., Spec. Div., 1994) (per curiam). The court stated in those cases that no executive branch authorities, including a politically appointed Attorney General, would have

subjected such attempts to criminal prosecution, and thus the "but for" requirement was fulfilled as no fees would have been incurred "but for" the appointment of the Independent Counsel. *Id.* The situation here appears to be analogous – executive branch authorities do not treat "bureaucratic conflicts" as criminal, and the Department of Justice says as much in its evaluation: "[An] internal disagreement of this sort over a prosecution decision would rarely, if ever, lead to a criminal investigation by the Department of Justice."

Furthermore, addressing the "but for" requirement in *In re Nofziger*, 925 F.2d 428, 444 (D.C. Cir., Spec. Div., 1991) (per curiam), we held that the appropriate question was whether "Nofziger, absent the statute, [would] have been similarly investigated and prosecuted by the Department of Justice . . . ." In its evaluation the Department strongly opines more than once that the answer to that question here is in the negative:

> [I]t is unlikely that an investigation of the pertinent matters in this case would have been conducted by the Department of Justice absent the existence of the Independent Counsel statute.

> It is exceedingly unlikely that the core allegations that gave rise to the Independent Counsel's investigation with respect to IRS employees would have led to an investigation by an ordinary prosecutor.

In sum, it appears that in the absence of the Act an investigation of this matter would *not* have been undertaken by the Department of Justice, and Finkelstein would therefore not have incurred attorneys' fees "but for" the appointment of the Independent Counsel.

*C. Fees are "Reasonable" under the Act*

This court must determine whether Finkelstein's attorneys charged reasonable rates, and whether the time expended by Finkelstein's attorneys on his representation was reasonable. *In re Meese*, 907 F.2d 1192, 1201 (D.C. Cir., Spec. Div., 1990) (per curiam). The IC argues that, should the court find that Finkelstein passes the "subject" and "but for" tests, several of the billing entries are unreasonable under this court's precedents and should be denied. First taking issue with various time-billing entries, the IC asserts that deductions should be made for meetings between multiple attorneys representing Finkelstein, phone conferences between Finkelstein's attorneys, two or more of Finkelstein's attorneys conferring on the case, and two or more attorneys billing for the same task. The IC then addresses Finkelstein's request for expenses, asserting that certain items for cab fare, photocopying, courier service, and computer research should be rejected or reduced in that they "are generically described, without an explanation of why the services were necessary or a specific correlation to the tasks performed by attorneys on any given day."

The DOJ, while stating that "the fees generally are adequately documented and appear to be reasonable," brings two points to the court's attention. First, the DOJ notes that the fee application seeks approximately $40,000 for work performed in connection with Finkelstein's response to the IC's Final Report, and that such an amount is "disproportionately large in light of the overall request, and, under this Court's precedents, cannot be reimbursed in full." Second, the DOJ asserts that deductions should be made for charges for multiple attorneys attending grand jury appearances.

The billing documents appear to contain sufficient descriptions of the work performed and the fee application

includes an affidavit attesting to the reasonableness of the hourly rates charged. The main concern appears to be, as the DOJ notes, the significant amount ($40,643) requested for reviewing and responding to the IC's Final Report. This amount is 37% of the total requested. In prior cases involving requests for significant fees for review of an independent counsel's final report, the court reduced those fees to between 10 and 15 percent of the total requested. *See, e.g., In re Madison Guar. Sav. & Loan Assoc. (Moore Fee Application)*, 406 F.3d 675, 683 (D.C. Cir., Spec. Div., 2005) (per curiam) (reduction from 45 to 15 percent); *In re North (Shields and Gruner Fee Applications)*, 53 F.3d 1305 (D.C. Cir., Spec. Div., 1995) (per curiam) (reduction from 20 to 10 percent).

Several factors, however, appear to make this case unusual concerning the review and comment period to the Final Report. First, Finkelstein (as well as others who were mentioned in the Final Report) pursuant to orders of the court, was allowed to review the Report on more than one occasion: once when the Report was set to be publicly released, but minus the section concerning the obstruction investigation; and once after a determination was made to release the Report in full. Second, as the DOJ points out, Finkelstein's attorneys billed a fair amount of time addressing the issue of the possible public disclosure of the Report, an issue that was to ultimately take up a considerable amount of time of all parties involved. Third, a significant portion of the billing concerning the Final Report appears to concern the matter of Finkelstein's grand jury testimony, much of which is included in the Report. Taking all of these factors into consideration, we find that the amount billed for the review and comment period is reasonable.

As the OIC points out, however, the expense pages contain multiple entries for "Taxi" cab rides, "Photocopying," "Courier Service," and "Computer Legal Research," all of which are not

otherwise explained. The total amount sought for these entries is $1,588.09. The court has in the past made deductions for comparable expenses because of a lack of supporting documentation, *see, e.g., In re Madison Guar. Sav. & Loan (Marceca Fee Application)*, 366 F.3d 922, 929 (D.C. Cir., Spec. Div., 2004) (per curiam), and should do so here, reducing the amount by $750.00. We find the remaining arguments made by the OIC and DOJ concerning the unreasonableness of certain fees and expenses to be without merit.

In sum, Finkelstein has requested that his attorneys' fees be reimbursed in the amount of $110,763.09. Deductions in the amount of $750 yields a total to be reimbursed of $110,013.09.

## Conclusion

In light of the foregoing discussion, Barry J. Finkelstein shall be reimbursed for attorneys' fees and expenses in the amount of $110,013.09.